**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-00159-WJM-MEH

**DESIREE JOHNSON**

Plaintiff,

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA,** d.b.a. and referred to as
"CIGNA," and d.b.a. CIGNA Group Insurance,

Defendant.

---

**PLAINTIFF'S OPENING BRIEF ON THE MERITS UNDER ERISA**

---

Plaintiff Desiree Johnson, under ERISA, 29 U.S.C. § 1132, submits her opening brief on the merits.

A. <u>INTRODUCTION</u>

In August 2013, Life Insurance Company of North America, doing business as "CIGNA," cut off the long-term disability ("LTD") benefits CIGNA was paying to Desiree Johnson for the previous 24 months. CIGNA announced the cut-off as of July 31, 2013.

Both the Social Security Administration ("SSA") and CIGNA found that Desiree Johnson was disabled starting in December 2010. Both decided that her disability benefits started in June 2011. CIGNA paid LTD benefits to Desiree Johnson at two-thirds (2/3) of her earnings from her employment with GEICO. CIGNA paid Desiree Johnson $4,355 per month.

CIGNA asserted that Desiree Johnson was "no longer" disabled. CIGNA did not cite medical evidence showing Desiree Johnson had improved. She continued to be disabled within the meaning of the group LTD insurance policy ("Policy") issued by CIGNA to GEICO.

1

To fulfill its cutoff of benefits, CIGNA required Desiree Johnson to attend an exam in July 2013 with its hired reviewer, Lloyd Thurston. He was not familiar with her disabling illness, Trigeminal Neuralgia ("TN"). It caused her debilitating pain and impairments. She was forced to stop work in December 2010. Dr. Thurston criticized Desiree Johnson. He said she was exaggerating and there was no "objective" evidence.

Desiree Johnson appealed to CIGNA. CIGNA was required to fully and fairly consider her appeal. CIGNA upheld its cutoff of LTD benefits. CIGNA's records-reviewers failed to give credit to the evidence. They did not examine her. They did not consider the years of clinical treatment for TN. Instead, they relied on adversarial comments by Dr. Thurston and argued a lack of "objective" findings. CIGNA made its last appeal denial on May 22, 2015.

Desiree Johnson filed suit under ERISA in late 2015 in the Denver District Court. CIGNA removed this action to the U.S. District Court.

Pending is Plaintiff's Motion to Compel Discovery Responses. The Magistrate Judge required CIGNA to supplement some responses. Plaintiff objected to the limited relief. Additional information should be added to the Administrative Record (also referred to as "AR" or "Johnson Rec."). 29 U.S.C. § 1132 (a) (1) (B).

B. NATURE OF THE CASE

This action is like an appeal from decisions by the Plan fiduciary. Judicial review is based upon the AR. See *Metropolitan Life Insurance Company v. Glenn,* 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008). Judicial review is not the same as summary judgment under Fed. R. Civ. P. 56.

The AR should be supplemented by public information about CIGNA's history. Pending is Plaintiff's Motion to Supplement the AR for discovery responses.

Desiree Johnson seeks LTD Benefits. Benefits have been accruing at the rate of $4,355 per month (according to CIGNA) or $4,542 per month (according to Desiree Johnson, based on her last rate of pay and full-time hours) since June 9, 2011. CIGNA paid $4,355 per month from June 9, 2011 through March 31, 2013. The Policy calls for an "offset" from LTD benefits of the initial, primary-SSDI benefits of $2,052 per month and dependent-SSDI benefits of $1,026 per month. The dependent-benefits run through May 1, 2017.

CIGNA stopped paying Desiree Johnson LTD benefits because in January 2013 Desiree Johnson was awarded SSDI benefits retroactive to June 2011, resulting in an "overpayment." Net benefits withheld during the last four years must be credited to the prior "overpayment." CIGNA has been obligated to resume benefits since October 24, 2016.

Judicial review should be "*de novo.*" Or, if judicial review is based upon the "arbitrary and capricious" standard (applicable when a plan fiduciary exercises discretion), there must be a reduction in deference to CIGNA's decisions. The lack of substantial evidence requires reversal.

C. <u>ISSUES</u>

1. Under ERISA, should the Court employ the *de novo* or an arbitrary and capricious review standard in evaluating CIGNA's cut off of benefits after 24 months?

2. Did CIGNA exhibit bias toward Desiree Johnson?

3. Does CIGNA have a history of bias in claims administration?

4. Should CIGNA be ordered to provide discovery responses about its conflict of interest, procedural irregularities, and substantive facts on the merits, and should Plaintiff's pending Objection to the Magistrate Judge's discovery rulings be approved?

5. Should the Administrative Record ("AR") be supplemented with discovery responses and other materials needed for judicial review of the merits and should plaintiff's pending Motion to Supplement the Administrative Record be granted?

6. Did CIGNA commit procedural irregularities and deny Desiree Johnson full and fair review in violation of ERISA?

7. Did CIGNA lack evidence to justify its cutoff of LTD benefits after paying her for 24 months?

8. Did CIGNA decide the appeal contrary to the evidence, make arbitrary and capricious decisions, or act in bad faith?

D. <u>STANDARD OF REVIEW</u>

Judicial review should be *de novo*. Alternatively, if the arbitrary and capricious standard of review applies this is subject to a reduction in deference if the conflict of interest has been influential. Under *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 114-15 (2008), the AR and discovery should guide this determination.

Based on ERISA, CIGNA owes fiduciary duties to Desiree Johnson and must act solely in her interest as the Plan participant. See 29 U.S.C. § 1104 (a) (1).

In 2008, Colorado passed § 10-3-1116 (2), C.R.S. This renders the reservation of "discretion" by CIGNA in the Policy *void*. The absence of discretion mandates that judicial review be *de novo*. *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 109, 115, 109 S. Ct. 948 (1989). Colorado's insurance law is saved from "preemption" under ERISA's "savings clause." 29 U.S.C. § 1144(b) (2) (A). *Arapahoe Surgery Center, LLC v. CIGNA Healthcare, Inc.,* 2006 U.S. Dist. LEXIS 36103, *[21]-[24] (D. Colo., March 21, 2016), held that because of that statute, "… insured Colorado plans are in the *de novo* category…."

A similar determination applies in Illinois. See *Kaferly v. Metro Life Insurance Company*, 2016 U.S. Dist. LEXIS 79522, *[13]-[24] (D. Colo., May 31, 2016). *Id.* See also, *Borich v. LINA*, 2013 U.S. Dist. LEXIS 59674 (N.D. Ill., April 25, 2013).

The *de novo* standard does not conflict with ERISA's remedial scheme. *Shafer v. Metropolitan Life Insurance Company*, 80 F. Supp. 3d 1255, 1257 (D. Colo., February 19, 2015). Desiree Johnson resorts to § 10-3-1116 (2), C.R.S, as amended. *Id.*, at 1255, fn. 3.

Importantly, §10-3-1116 (2), C.R.S., as amended, is a law "regulating insurance" within the meaning of ERISA's savings clause, 29 U.S.C. § 1144 (b) (2) (A). *McClenahan v. Metropolitan Life Insurance Company*, 621 F. Supp. 2d 1135, 1141 (D. Colo., 2009) held that §10-3-1116 (2), C.R.S, as amended, was not preempted by ERISA.

CIGNA argues that the Colorado law was enacted after the issuance of the Policy. CIGNA ignores the fact that the key transactions occurred <u>after</u> the passage of the Colorado law. And, after 2008, Desiree Johnson paid added LTD premiums to "buy-up" the benefits to 66 2/3% of basic monthly earnings ("BME").

It is not necessary to consider the 2008 Colorado insurance law to be "retroactive." The important question is whether the 2008 law applies to CIGNA's challenged conduct and the transactions between the parties. CIGNA cut off benefits and denied Desiree Johnson's administrative appeals from 2013 to 2015. CIGNA had approved the payment of LTD benefits from June 9, 2011 through July 31, 2013. CIGNA issued its final denial on May 22, 2015, seven years after the new law.

CIGNA's cutoff decision and appeal denials, as well as Desiree Johnson's renewed elections are the transactions and conduct subject to judicial review under 29 U.S.C. § 1132. Under *McClenahan v. Metropolitan Life Insurance Company*, 416 F. Appx. 693, 696, 2011 U.S.

App. LEXIS, *6-8 (10th Cir. 2011), the effectiveness of a statute is determined with reference to when it operates on *conduct and transactions.* There is no issue here about "vested" rights arising before a statute's effective date. While the Policy was issued in 2007 (AR 023), there were no vested rights before then. Therefore, *de novo* review should apply.

If the Court were to find that arbitrary and capricious review should govern, *Murphy v. Deloitte & Touche Group Insurance Plan*, 619 F. 3d. 1151 (10th Cir. 2010), dictates here that "deference" to the decisions of CIGNA must be *substantially reduced.*

E. FACTS

　1.　Undisputed facts established by the pleadings:

　　a.　Desiree Johnson worked as an active, full-time employee of GEICO Corporation. She served as a field supervisor, analyst and auditor as well as a field manager in automobile property damage claims. [Complaint and Answer, par. 2]

　　b.　GEICO was the Plan sponsor and policy-holder for the Plan under the group Policy of insurance providing for long-term disability (LTD) benefits for employees. [Com. and Ans. par. 3]

　　c.　CIGNA issued the Group Policy, number FLK 980028 (the "Policy") to GEICO to fund LTD Benefits. Desiree Johnson was a participant in the Plan and Policy. [Com. and Ans. par. 4]

　　d.　Life Insurance Company of North America (dba and referred to by Plaintiff as "CIGNA") is an insurance company that has done business in Colorado. [Com. and Ans. par. 7].

e. CIGNA has been the Claims Administrator under the GEICO Plan. Eligible participants in the Plan receive LTD benefits under the Policy subject to their satisfaction of its terms and conditions. [Com. and Ans. par. 8]

f. The Policy is a part of the GEICO Plan. The Plan is an employee welfare benefit plan. The Employee Retirement Income Security Act ("ERISA") governs the Plan. CIGNA both funds LTD benefits and administers claims. [Com. and Ans. par. 12]

g. Desiree Johnson, as an eligible participant under the Plan and Policy, was paid LTD benefits by CIGNA. [Com. and Ans. par.18]

h. From June 2011 through July 2013, Desiree Johnson was considered by CIGNA to be unable to perform the material duties of her "regular occupation." [Com. and Ans. par. 19]

i. CIGNA approved LTD benefits to Desiree Johnson from June 9, 2011 through July 31, 2013. [Com. and Ans. par. 20]

j. In December 2010 Desiree Johnson discontinued working for GEICO. She presented a claim for short-term disability benefits and then LTD benefits to CIGNA under the Policy (claim no. 2363495). [Com. and Ans. par. 22]

k. Between December 2010 and June 2011, Desiree Johnson's disability from her "regular occupation" continued for 180 days and satisfied the "elimination period" under the Policy. [Com. and Ans. par. 23]

l. CIGNA announced the approval of LTD benefits in the spring of 2011. [Com. and Ans. par. 24]

m.  Desiree Johnson provided evidence to CIGNA and allowed CIGNA to obtain evidence from her treating physicians. [Com. and Ans. par. 26]

n.  As reflected in the AR, Desiree Johnson presented materials to CIGNA about her disability. She claimed chronic pain and impairments. She claimed her health problems included TN, occipital neuralgia, peripheral neuralgia and neuropathy. She asserted facial and neck pain. Her doctors said she had chronic pain syndrome. She also described chronic migraine and cluster headaches. They cited temporo-mandibular joint dysfunction. She had vision problems, facial swelling, eyelid drooping, pain in the left eye, pain behind both eyes, left-arm numbness, bilateral-hand cramping and clutching, cervical- disc degeneration, radiculopathy and dystonia, and side effects from medicine. She had many nerve block injections. She described loss of stamina and cognitive deficits resulting in diminished functional capacity for any relevant employment. [Com. and Ans. par. 28]

o.  Desiree Johnson paid for LTD benefits at the rate of 66 2/3% of her prior basic monthly earnings (BME). [Com. and Ans. par. 29]

p.  Desiree Johnson's BME were over $81,773 per year according to her calculation. At two thirds of BME, CIGNA approved LTD benefits during the 1st 24 months for $4,355 per month in gross benefits. [Com. and Ans. par. 30 and 31]

q.  The Policy allows for an offset from LTD benefits for Social Security Disability Insurance ("SSDI") benefits received. That offset uses the initial primary SSDI benefits of $2,052 per month and dependent-SSDI benefits

for Desiree Johnson's two children, of $1,026 per month. For dependent SSDI benefits, the offset of $1,026 per month applies when her children are under 18 or still in high school, and that ends May 1, 2017. [Com. and Ans. par. 32 and 33]

r. Based upon SSDI benefits, a resulting "overpayment" occurred. [Com. and Ans. par. 35].

s. On August 21, 2013 CIGNA decided that Desiree Johnson should no longer receive LTD benefits after July 31, 2013. [Com. and Ans. par. 40]

t. Desiree Johnson submitted two timely appeals of CIGNA's decision. [Com. and Ans. par. 41]

u. In January 2013, CIGNA received the decision by the SSA that Desiree Johnson's was totally disabled as of December 2010. [Com. and Ans. par. 44]

v. CIGNA upheld its benefits cut-off determination on appeal. CIGNA issued its final appeal denial on May 22, 2015. [Com. and Ans. par. 42 and 45]

w. Desiree Johnson fully exhausted contractual and administrative remedies. [Com. and Ans. par. 47]

x. CIGNA had the dual-role capacity of the determiner and funder of LTD benefits. [Com. and Ans. par. 49]

y. The Policy does not contain a "limitation or restriction calling for disregarding or minimizing a symptom that would be, in part, considered 'self-reported.'" [Com. and Ans. par. 53]

2. <u>Facts from discovery:</u> CIGNA admitted facts in discovery and the AR. Additional

facts are anticipated as shown the Objection and Plaintiff's Motion to Supplement the

AR.

    z.  For Lloyd Thurston, D.O., CIGNA used his services for reviews of claims:

none in 2011, none in 2012, and four times in 2013. CIGNA paid $8,230

to Lloyd Thurston for his reviews during 2013 (the year of his review

about Desiree Johnson).

    aa.  For Todd Graham, M.D., CIGNA used his services for reviews of claims:

none in 2012, none in 2013, and 14 times in 2014. CIGNA paid $11,910 in

2014 for Dr. Graham's 14 reviews (the year of his review about Desiree

Johnson).

    bb.  For Jamie Lewis, M.D., CIGNA used his services for reviews of claims:

none in 2013, none in 2014, and 12 times in 2015 (the year of his review

about Desiree Johnson). CIGNA paid $7,610.50 for Dr. Lewis's reviews in

2014.

    cc.  For David Hoeing, M.D., CIGNA used his services for reviews: none in

2013, one time in 2014, and 27 times in 2015. CIGNA paid Dr. Hoeing

$646.25 for one review in 2014, and $17,414.75 for the 27 reviews in

2015 (the year of his review about Desiree Johnson). [CIGNA's Answer to

Interrogatory # 3]

    dd.  CIGNA asserts that a key component of its claim "philosophy" is prompt

and accurate payment of all covered claims. [CIGNA's Answer to

Interrogatory #5]

ee. The Administrative Record ("AR") contains materials that CIGNA complied and received during the administration of Desiree Johnson's claim from the inception of claim until the "closing" of the AR. [CIGNA's Answer to Interrogatory #7].

ff. The *curricula vitae* of doctors Thurston, Graham, Lewis, and Hoenig were supplied by CIGNA with its supplemental Answer to Interrogatory #4 [LINA 1–17], and they are attached to this Brief.

gg. CIGNA entered into the Regulatory Settlement Agreement ("RSA") in May of 2013 with insurance regulators. A copy of the RSA was submitted with Plaintiff's Motion to Compel and is attached to this Brief. [See CIGNA's supplemental Answer to Interrogatory #5.]

hh. On February 20, 2015, CIGNA sent a copy of its LTD file to Desiree Johnson's attorney. AR 250. Also, CIGNA asserts that on March 18, 2014 it sent a copy of the claim file to Desiree Johnson. AR 267. The parties disagree about that assertion.

ii. CIGNA understood that Desiree Johnson considered herself to be disabled from performing "any occupation" based on submissions during her claim. [CIGNA's Supplemental Answer to Request for Admission # 9]

jj. Desiree Johnson has not worked full-time since the end of her active work for GEICO in December 2010. [CIGNA's Supplemental Answer to Request for Admission #13, subpart 3]

kk. Desiree Johnson asserts that her earnings from GEICO were $81,773- about $83,000 per year. CIGNA asserts her earnings were $78,387.96

annually. [See CIGNA's Supplemental Answer to Request for Admission #13, Subpart 6.] AR 58.

    ll.   Desiree Johnson paid premiums to CIGNA to "buy-up" LTD benefits.

[CIGNA Supplemental Answer to Request for Admission #13, Subpart 8]

3.  <u>Supplemental Discovery Responses</u>. CIGNA should provide more discovery responses and they should be considered on the merits.

4.  <u>Facts Based on the Administrative Record (AR)</u>:

    a.  <u>Overview.</u>

The Policy provides for a maximum period of benefits payable through age 65. AR 028. The concept of "proof" is not defined in the policy. AR 031.

The Policy provides a 24-month limitation on LTD benefits for certain types of mental illness. AR 034. But, that limitation has not been invoked and it is not applicable here.

The Policy defines "Regular Occupation." AR 042. Given the facts in the AR, Desiree Johnson's regular occupation as an auto damage claims field supervisor is uncontested.

GEICO appointed CIGNA as "Claim Fiduciary." AR 052. CIGNA maintained its "claim record" appearing as "ACCLAIM" notes. (c. 192 pages) AR 055-247. CIGNA's entries show it accepted the disabling conditions. Later, in 2013 some entries began to reflect unfair or misleading speculation by CIGNA. That started with its "AO" investigation.

CIGNA first said Desiree Johnson's attorney indicated that "no further" medical records were being sent. AR 084. CIGNA then noted that it expected more medical records.

CIGNA used the wrong earnings (BME) to calculate LTD Benefits. AR 085.

CIGNA acknowledged in February 2014 that it did receive from Desiree Johnson a signed authorization (Medical Authorization Release form) that allowed CIGNA to release its file. AR 094.

CIGNA received Desiree Johnson's 1st appeal on a timely basis, but CIGNA said her appeal was "removed" or being returned. AR 104.

CIGNA said that it would not conduct a vocational assessment, deeming it unnecessary because CIGNA decided to cut off benefits by its "any occupation" ("AO") decision. AR 117. In 2013 CIGNA assumed that the change in Policy definition from "Own Occupation" to "Any Occupation" ("AO") allowed CIGNA to not obtain a vocational assessment. That conflicted with the need for a factual determination about what occupations could be considered relevant. The Policy requires an occupation consistent with the education, training, and experience of Desiree Johnson and from which she could earn at least 80% of her former BME, as indexed for inflation. AR 113.

CIGNA recited it's "mission" is to help injured customers. AR 114. This philosophy is stated emphatically in CIGNA's "Code of Ethics and Principles of Conduct," a public document that is undisputed and a copy of which is attached. Judicial notice of it is requested. FRE 201.

CIGNA acknowledged that Desiree Johnson reported that CIGNA's "independent" reviewer, Lloyd Thurston was "unprofessional." AR 118.

CIGNA said it wanted to evaluate Desiree Johnson as the "whole person." CIGNA previously acknowledged Desiree Johnson's restrictions and limitations ("R&L's"). Yet, in 2013 CIGNA's strategy was to "close" the claim. CIGNA contradicted its earlier findings and falsely asserted that Desiree Johnson could "drive a car" for work despite the evidence. AR 125-26.

CIGNA had accepted the importance of pain and the absence of health improvement for Desiree Johnson, but CIGNA ignored that in 2013.

While working on the claim, CIGNA said that "a copy of the (LTD) policy is not needed." AR 138.

In March 2013, CIGNA planned to reduce LTD benefits to $1,277 per month based upon an SSDI offset. AR 147.

Before cutting off LTD benefits, CIGNA acknowledged the significance of pain causing loss of work capacity for Desiree Johnson. AR 161. CIGNA found that the medical evidence "continues to support" the payment of LTD benefits. AR 164. CIGNA had acknowledged that it was medically necessary for Desiree Johnson to get "nerve blocks" to relieve some neuropathic pain. AR 168. CIGNA knew Desiree Johnson's impairments were supported. AR 205. CIGNA acknowledged that "nerve damage" was undisputed. AR 231.

Apart from its computer notes, CIGNA's other documents (spanning about 920 pages) show the impairments of Desiree Johnson and her satisfaction of the Policy.

When Desiree Johnson pursued her 2nd appeal, CIGNA again responded that it was "unable to accept the appeal." AR 248. CIGNA argued here was a supposed lack of "time-concurrent" evidence. That concept is not found in the Policy. CIGNA did not explain why ongoing evidence of health impairments and treatment could be irrelevant.

In February 2015, CIGNA sent a copy of its claim file to her prior lawyer. AR 250. Yet, CIGNA had received an authorization form signed by Desiree Johnson a year earlier. AR 094.

Similar to CIGNA's rejection of the 2nd appeal in February 2015, CIGNA said in 2014 that it was "unable to accept" the 1st appeal and it was being "returned." AR 251-52.

In August 2014, CIGNA confirmed its cut off of a year earlier, asserting the R&L's were not medically supported. CIGNA concealed the name of its consulting doctor. AR 254-56.

On May 2, 2014 CIGNA said that a copy of its claim file was being sent. AR 264. However, it was not received until February 15, 2015. AR 250. On March 18 and April 22, 2014 CIGNA said that it had not received an authorization form signed by Desiree Johnson, while CIGNA internally admitted that it received her authorization on March 5, 2014. AR 265, 267.

In August 2013, when CIGNA cut off LTD benefits by asserting Desiree Johnson no longer remained "disabled as defined," CIGNA did not give a reasonable explanation. CIGNA merely "concluded," without evidence, that Desiree Johnson could occasionally handle 11 to 20 pounds in a work setting. AR 274 – 77.

In March 2013 CIGNA threatened to sue Desiree Johnson for an "overpayment." CIGNA was aware that she continued to be eligible for benefits to reduce the "overpayment."

On May 4, 2015, CIGNA's record reviewer, Dr. Hoenig of "MLS" provided his "peer" report without examining Desiree Johnson. That report was not shared with Desiree Johnson before her suit was filed and she did not have a "full & fair" chance to address it.

Dr. Hoenig accepted Desiree Johnson's health problems due to TN. However, contrary to CIGNA's express assurance to Desiree Johnson not to defer to previous reviews (AR 0238), Dr. Hoenig relied on the IME by Dr. Thurston of July 2013. Dr. Hoenig showed no awareness of Desiree Johnson's affidavit of March 25, 2015, possessed by CIGNA. AR 0382-87. Dr. Hoenig even confirmed with treating physician Dr. Egle Bakanauskas that severe pain was the most "debilitating" factor for Desiree Johnson. But, without clinical support, Dr.Hoenig baldly concluded that pain could be doubted by calling it merely "subjective."

Dr. Hoenig and MLS are not "independent." Attached is a publicly available webpage for MLS describing its services. MLS serves the insurance industry, not disabled employees. AR 359-66. This undisputed document should be considered based on judicial notice under FRE 201.

On May 4, 2015, CIGNA had its reviewer, Jamie Lewis, M.D, also of MLS, provide his "peer" report. (Dr. Lewis and MLS appear in various reviews for plan insurers and administrators. See, e.g., *May v. AT &T Integrated Disability*, 2013 U.S. Dist. LEXIS 105023 [*11] (N.D. Ala., July 26, 2013).) Dr. Lewis did not examine Desiree Johnson. Like Dr. Hoenig, and contrary to CIGNA's promise (AR 0238), Dr. Lewis relied on Lloyd Thurston's review. Dr. Lewis merely "concluded" that there were no supported "objective medical findings." He stated this for CIGNA despite the fact that TN does not typically manifest with "objective" signs. Dr. Lewis' should also not be considered independent. AR 369.

In discovery, CIGNA contended that its consultants were involved through vendors and they were not informed about disability definitions. In contradiction, CIGNA's "vendor referral" form announced to its reviewers that this was an "AO" issue for "LTD." Thus, the reviewers were informed by CIGNA that the question was "disability" from "any occupation" and there was a dispute over LTD insurance benefits. This influenced the reviewers. That is shown by the fact that no consideration appears in their reports about the relevancy of occupations based upon the education, training, and experience of Desiree Johnson, and her need to earn at least 80% of her previous BME. In other words, the reviewers were given a premise that Desiree Johnson merely needed to have capacity for "any" work whatsoever. They did not look at the relevance of pain as it affected Desiree Johnson's capacity for relevant employment (such as serving as a field supervisor). All relevant positions require regular vigorous physical and intellectual activity.

Being impaired by chronic pain (such as from TN on a recurrent basis with facial pain and cluster, migraine headaches) was ignored. AR 376.

Desiree Johnson provided her affidavit during the appeal. AR 382-87. This verified her lawyer's detailed factual submission in March 2015. AR 0388-426. This demonstrated her ongoing loss of capacity due to TN. The affidavit also established the adversarial and unqualified exam by CIGNA's Lloyd Thurston in July 2013, on which CIGNA based its cutoff decision. AR 382-87.

Throughout CIGNA's file, evidence of clinical treatment needed by Desiree Johnson, especially nerve blocks for severe pain due to Trigeminal Neuralgia, appears. E.g., AR 431-35.

When CIGNA enlisted Dr. Graham in August 2014 to reject Desiree Johnson's 1st appeal, CIGNA cited Dr. Thurston's "IME" of July 2013. Thus, CIGNA did not gather "independent" evidence. AR 442.

In January 2014, treating physician Egle Bakanauskas, M.D., opined, as he had many times before with clinical evidence, that the applicable diagnosis is TN and that it has been disabling for Desiree Johnson. AR 457-59.

In March 2014 Dr. Bakanauskas gave more evidence to CIGNA on CIGNA's Questionnaire. He stated how Desiree Johnson suffered from R & Ls due to pain. They caused her to be totally disabled from "any" work. AR 594-99.

In August 2013, utilizing Lloyd Thurston, CIGNA created a notion that Desiree Johnson could occasionally handle 11 to 20 pounds, and frequently 10 pounds. See, AR 0382-87, explaining the lack of such capacity. CIGNA failed to take into account the relevance of chronic pain. AR 622-23.

In connection with Dr. Thurston's review in July 2013, CIGNA wrote a Transferable Skills Analysis ("TSA"). But, that was based upon Dr. Thurston's biased IME and his erroneous Physical Abilities Assessment ("PAA") (e.g., he assumed, erroneously, that Desiree Johnson had the capacity to handle 11 to 20 pounds in a work setting.). AR 624.

CIGNA's Dr. Thurston attempted to minimize pain and other chronic impairments as merely "anxiety and a pain disorder." After talking with Desiree Johnson he said there was no support for physical R & Ls. He admitted to her that he is not a neurologist and not acquainted with TN. AR 626-30, and see AR 382-87.

In January 2013, CIGNA's SSDI benefits vendor, Allsup, wrote its recommendation for collection of an "overpayment" of LTD benefits. This conflicted with Allsup's role as the representative of Desiree Johnson. AR 644.

In January 2013, CIGNA had obtained from Desiree Johnson and her treating doctor's Questionnaire evidence stating her disabling symptoms and loss of work capacity. AR 660-670.

In 2012 and early 2013 CIGNA recorded the clinical diagnoses of chronic facial pain, neck pain, left arm numbness, and the lack of work capacity, without dispute. See AR 690-91 and 693-703. Pain resulted in loss of functioning for Desiree Johnson. Pain returned after nerve blocks and was repeatedly recorded by CIGNA. See, e.g., AR 721, 753, 781-2, 800, 863, 928, and 940. CIGNA acknowledged that Desiree Johnson could not drive or travel for work because of pain. CIGNA acknowledged that Desiree Johnson was disabled from even "sedentary" work. CIGNA approved benefits on May 18, 2011. AR 940. CIGNA recorded the relevance of TN, impaired speech, headaches, the need for narcotics, and positive findings from an MRI of the cervical spine showing Degenerative Disc Disease (DDD) at C-5-C-6. AR 945. CIGNA's

Questionnaire established the importance of debilitating pain, narcotic medications, and the absence of cognitive strengths for Desiree Johnson. AR 982.

This survey of the AR illustrates operative facts and the bias CIGNA. More detailed facts follow. [1]

b. Facts in the AR about which the parties have different interpretations and which further demonstrate the need for reversal of the cutoff decision

Plaintiff's "Index" to the AR and Table of Contents for the AR are attached to assist with the location of subjects in the AR.

CIGNA knew the pertinent diagnoses and symptoms. They were acknowledged very early. AR 0184. CIGNA observed TN as the primary medical condition that impaired Desiree Johnson. CIGNA stated the evidence "continues to support" LTD benefits. Nerve blocks were required for many years. AR 0164. CIGNA acknowledged that TN caused spasms in Desiree Johnson's face and eye. AR 0125. CIGNA accepted the disabling conditions. AR 0167. CIGNA also even acknowledged the ongoing illnesses when it denied her appeals. AR 0076.

Desiree Johnson suffered from slurred speech and curved or cramped hands. She needed narcotics for pain. She suffered from cervical pain at C5-C6. CIGNA accepted her loss of functionality and nerve damage when CIGNA approved her benefits in May 2011. AR 0209.

CIGNA utilized its disability Questionnaires. CIGNA accepted the fact that pain resulted in total disability for Desiree Johnson. AR 982 – 987. Desiree Johnson wanted to return to work. She had spent about four years in her occupation doing field audits that required frequent travel.

---

[1] Because the facts in the AR are pertinent to several issues, this Brief contains repetition about facts that is necessary to support the Argument.

*Id.* Dr. Egle Bakanauskas confirmed that due to TN Desiree Johnson was totally disabled. See, e.g., May 2, 2014, AR 594-599.

Dr. Bakanauskas' clinical note of January 14, 2013, states facts about ongoing neck pain, muscle weakness, fatigue, dizziness, and other symptoms due to TN. AR 661. Dr. Bakanauskas had reported early in 2011 that because of TN pain, Desiree Johnson was totally disabled and could not travel, drive reliably, engage in lifting, and perform regular activities. AR 0781)

Throughout her treatment, CIGNA acknowledged evidence that Desiree Johnson had not improved. See, e.g., reports in early 2011 and following. AR 0660, 0693, 0696, 0700, 0703, 0926, 1019, 1022, 1025, 1031-33. Dr. Bakanauskas reported his qualified evaluations. Her symptoms were consistent with clinical findings. AR 0784. His skills and knowledge and the reliability of his clinical evidence were never doubted. He supplied to CIGNA a Physical Abilities Assessment ("PAA") report stating she was unable to work due to pain and that pain resulted in her total disability. AR 0926.

Similar evidence was provided by treating neurologist, Jason Krutsch, MD. He observed, as early as December 6, 2010, that chronic pain resulted in her disability. Her abilities to engage in speech, travel, driving, lifting, and other activities were impaired. AR 1029 –1030.

CIGNA spoke periodically with Desiree Johnson. She reported about her diagnoses and impairments and described the evidence. No contrary evidence ever appeared. AR 0221.

While problems with debilitating pain appear throughout the AR, such as cluster, migraine headaches, later, to try and justify its cutoff, CIGNA created an assumption that there were no clinical findings and no cognitive impairments for Desiree Johnson. AR 0238. As CIGNA prepared to cut off benefits in 2013, the language used began to shift. In 2013 CIGNA's words now showed sudden skepticism. E.g., after observing again that Dr. Krutsch was

regularly providing nerve block injections, CIGNA said he "… **only** gives [Desiree Johnson] pain/nerve block injections…" AR 0137(emphasis added).

During the payment of benefits CIGNA noted **undisputed clinical evidence**. E.g., this included the MRI of Desiree Johnson's cervical spine in April 2009, showing an objective diagnostic image for her ongoing neck pain and radiculopathy (numbness in the left arm), with DDD at C-5 - C-6. AR 1034.

CIGNA noted that Dr. Bakanauskas was a source for evidence. CIGNA looked to him for facts. AR 0136. Unlike some speculative observations by CIGNA, the AR shows that there were no discrepancies about chronic pain and impairments as well as medical reports and exams. AR 0641. After cutoff, CIGNA suddenly concluded that there were no cognitive deficits. Yet, during benefits, CIGNA recorded that pain did interfere with Desiree Johnson's ability to concentrate. AR 0929.

The abundant evidence of clinical treatment of TN and the debilitating effects of pain fills the AR. Included are records of the University of Colorado Hospital. Typically every 2 to 3 months, for years, Desiree Johnson has receive nerve block injections for TN. These have been performed through facial injections in the infra-orbital nerve, the auricular nerve, the facial-mental nerve, and the temporo-nerve. See the AR for that relevant care from 2009 through 2015: 919, 916, 912, 907, 901, 896, 891, 862, 853, 859, 952, 953, 836, 828, 960, 966, 815, 970, 807, 974, 797, 729, 734, 680, 729, 872, 721, 476-486, 684, 499, 490, 497, 678, 499, 503, 454, 508, 524, 457, 541, 600, 457, 558, 464, 469, 462 (listed here in date order).

Nerve blocks (e.g., AR 0503) have provided modest, but incomplete and only transitory relief. (E.g., on November 23, 2010, 75% pain relief was noted for only three weeks AR 0859.) TN pain was observed as the most prominent reason for the clinical care. E.g., AR 0807.

If chronic pain did not result in significant loss of function for Desiree Johnson, the treatments would never have occurred. In contradiction of its payment of benefits, in August 2013, CIGNA utilized its "IME" to speculatively suggest there was "conflicting" information. But, no evidence showed conflicting information. AR 0129.

The evidence never suggested that "newer" facts about impairments would not be as reliable as earlier evidence. AR 0125. During the 2nd appeal, and four weeks before its final denial, CIGNA was forced again to acknowledge the facts of the diagnosis of T N, cervical disc pain with numbness of the left arm, and chronic pain syndrome. AR 0076.

The AR shows that CIGNA accepted the health impairments of Desiree Johnson as proof of disability. Without evidence for its conclusory supposition of improvement, CIGNA reversed itself by relying on Lloyd Thurston. No evidence emerged to disregard the lengthy clinical record. Without foundation, Dr. Thurston suggested that Desiree Johnson was "exaggerating." Dr. Thurston said Desiree Johnson's treating doctors did not "believe" her. Dr. Thurston opined that shaking his hand, opening his office door, or driving to the exam demonstrated capacity for regular, relevant employment.

Dr. Thurston never offered support to disregard the clinical record and the findings of the SSA.

Dr. Thurston suggested that Desiree Johnson had "reaching" and "sitting" capacity. AR 0631. He did not consider the role of pain in an occupational setting. AR 0631. Dr. Thurston asserted she had "lifting" capacity for 20 pounds, but he did not provide evidence. AR 0632. When Dr. Thurston speculated that Desiree Johnson exaggerated, he did not take pain into account. AR 0238.

Dr. Thurston converted his IME report into a Physical Abilities Assessment ("PAA"). But, there the AR still reflects the pertinent diagnoses of chronic pain and TN. These facts were ignored in his PAA. AR 0631.

Dr. Thurston was not professional in the exam. This was reported to CIGNA on August 15, 2013. AR 0118. CIGNA paid him $1,795.00. AR 0130. He is not a neurologist. He has no familiarity with TN. See, *Curriculum Vitae* of Lloyd Thurston, attached, and the affidavit of Desiree Johnson. AR 382-87

Dr. Thurston's IME shows he gave no meaningful consideration to TN and pain. Instead, he was critical of Desiree Johnson being tearful in describing pain in her face and neck and the loss of her career. See IME report, AR 0238, 0626, 0631-32. Without support, Dr. Thurston simply assumed that TN problems for Desiree Johnson could not equal loss of her work capacity.

5. <u>Understanding TN</u>

Trigeminal neuralgia is a neurological condition. TN is severe paroxysmal, lancinating facial pain due to a disorder of the fifth cranial nerve. The diagnosis is clinical. Merck Manual; http://www.merckmanuals.com/professional/neurologic-disorders/nero-opp.[2] TN is a chronic condition that affects the trigeminal nerve. That is the nerve that carries sensation from your face to your brain. Mayo Clinic, Trigeminal Neuralgia- Mayo Clinic; http://www.mayoclinic.org/diseases-conditions/trigeminal-neuralgia/basics...Even a mild stimulation of the face, such as from brushing teeth, putting on makeup, wind, or touching, may trigger a jolt of excruciating pain. TN can progress and cause longer, more frequent bouts of searing pain.

---

[2] Judicial Notice is requested and appropriate for these publicly available, reliable, undisputed, and recognized medical descriptions in the named sources. See, FRE 201 (b) and (c).

TN, also known as tic douloureux, sometimes is described as the most excruciating pain known to humanity. The pain typically involves the lower face and jaw, although sometimes it affects the area around the nose and above the eye. The intense stabbing or electric shock-like pain is caused by irritation of the trigeminal nerve, which sends branches to the forehead, cheek and lower jaw. It is usually limited to one side of the face. AANS-Trigeminal Neuralgia; http://www.AANS.org/patient%20initialcapinformation/conditions%20and%20 treatment.

The trigeminal nerve is the fifth of twelve pairs of cranial nerves. It is responsible for providing sensation to the face. One trigeminal nerve runs to the right side of the head while the other runs to the left. Each has three distinct branches. After the trigeminal nerve leaves the brain, it divides into three smaller branches, controlling sensations throughout the face:

- The first branch controls sensation in a person's eye, upper eyelid and forehead.
- The second branch controls sensation in the lower eyelid, cheek, nostril, upper lip and upper gum.
- The third branch controls sensation in the jaw, lower-lip, lower gum, and some of the muscles used for chewing.

AANS-Trigeminal Neuralgia.

The pain of TN is either classic or atypical (TN1 or TN2). With TN1 or classic pain, there are definite periods of remission. The pain is intensely sharp, throbbing and shock-like, and is usually triggered by touching an area of the skin or by specific activities. TN2 or atypical pain often is present as a constant, burning sensation affecting a more widespread area of the face. With TN2, there may not be a remission period, and symptoms are usually more difficult to treat.

TN is a form of neuropathic pain. TN1 causes extreme, sporadic, sudden, shock-like facial pain that lasts anywhere from a few seconds to long as two minutes per episode. These

attacks can occur in quick succession, and volleys, as lasting as long as two hours. TN2 is characterized by constant aching, burning, stabbing pain of a somewhat lower intensity than TN1. Both forms may occur in the same person, sometimes at the same time. The intensity of pain can be physically and mentally incapacitating. National Institute of Health, National Institute of the Neurological Disorders and Stroke, Trigeminal Neuralgia fact sheet; https://www.nids.NIH.gov/disorders/patient-caregiver-education/fact sheet.

TN can be progressive. The attacks often worsen over time, with fewer and shorter pain-free periods before they recur. Eventually, pain free intervals disappear and medication becomes less effective. The disorder is not fatal, but it can be debilitating. Due to the intensity of the pain, some individuals may avoid daily activities or social contacts because they fear an impending attack.

6.  TN for Desiree Johnson

Desiree Johnson has primarily suffered from TN2. She also experiences the sudden, electrical shock, lightning-type pain episodes of TN1. TN2 atypical pain is constant and is exacerbated by activities such as cold air on the face. These facts are shown in the AR in multiple treatment records.

Desiree Johnson continues to receive nerve injections in the face and neck. She has disclosed ongoing treatment to CIGNA following its cut-off and the start of this action. As indicated in the Motion to Supplement, CIGNA has declined to accept such evidence. Some recent information has been supplied to the Court, filed under "restricted access." It demonstrates she underwent "Gamma Knife" surgery or stereotactic radiosurgery where computer imaging was used to direct highly-focused beams of radiation at the site where the trigeminal nerve exits

the brain stem. As clinical notes from the spring of 2016 indicate, Desiree Johnson did not experience significant relief from the Gamma Knife surgery.

7.  "Occupation" and other pertinent Policy provisions

The occupation of Desiree Johnson is important. The Policy distinguishes between Desiree Johnson's regular (her "own" occupation) and "any" occupation ("AO") for which she "may be qualified by education training and experience, and from which she can earn" at least 80% of her prior BME, as indexed for inflation.

The term "occupation" in the Policy affects the definition of disability. AR 026. For the first 24 months, an employee is "disabled" if she is "unable to perform the material duties of her Regular Occupation, and is unable to earn 80% or more of her Indexed Earnings working in her Regular Occupation." *Id.* The definition of "disability" changes:

"After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, she is:

1.  Unable to perform the material duties of any occupation for which she is, or may reasonably become, qualified based on education, training or experience; and

2.  Unable to earn 80% or more of her Indexed Earnings." *Id.* (Policy)."

"Covered earnings" under the Policy are defined to mean "an Employee's wage or salary as reported by the Employer for work performed for the Employer in effect just prior to the date Disability begins. Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of the change, if the Employer gives us written notice of the change and the required premium is paid." *Id.*

For Desiree Johnson, the Policy specifies the "effective date of insurance."

"An employee who is required to contribute to the cost of this insurance may elect to be insured only by authorizing payroll deduction in a form approved by the Employer and

the Insurance Company. The effective date of this insurance depends on the date coverage is *elected*." AR 29 (Policy; emphasis added).

The Policy provides for Social Security assistance: "the Insurance Company may help the Employee in applying for Social Security Disability Income (SSDI) benefits, and may require the Employee to file an appeal if it believes a reversal of a prior decision is possible." CIGNA referred Desiree Johnson to Allsup for representation. See AR 033.

"Regular occupation" is defined in the Policy as:

"The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location." AR 042.

The Policy does not define "own occupation" or "any occupation"(AO). Those terms and abbreviations appear throughout the AR. See, e.g., AR 0055, 0113, 0124, and 0135 (CIGNA's use of the "change" in definition of disability to "any occupation" ("AO")).

8. Desiree Johnson's occupation and career experience

The occupation of Desiree Johnson was as an **automobile damage claims field supervisor**. AR 0057. Thus, her experience was clearly not in a "sedentary" occupation. AR 0230. CIGNA designated her occupation in a category of "officials and managers." AR 0226. Desiree Johnson's jobs required driving and travel, among other regular intellectual and physical tasks. AR 0180.

This leads to a question whether driving and travel are considered duties of the occupation of automobile damage claims field supervisor "as it is normally performed in the general labor market in the national economy." See AR 042. CIGNA assumed that Desiree Johnson's regular occupation was "sedentary." AR 0205. CIGNA reviewed a description contained in the Dictionary of Occupational titles (the "DOT"), a description that would

generally suggest "sedentary." AR 0213. See DOT, 241.137018. At the same time CIGNA went to the effort of verifying that GEICO, like other companies, requires driving and travel for the position of a "field" supervisor dealing with claims. AR 0275 and 0165. Verification was received from GEICO on April 7, 2011. AR 0223. CIGNA learned that all of her jobs, as they have been performed in the economy, require driving and travel. AR 0944 and 1056. Because, there is no question that travel is required, generally, the job is not "sedentary" in the national economy. AR 0669. See, also, AR 0382-87, the affidavit of Desiree Johnson. Her 20-plus year career with GEICO required regular and persistent physical and intellectual activity, including travel and driving.

CIGNA investigated the duties required of Desiree Johnson. There was no point for CIGNA to consider that evidence if a DOT description was a final answer. While a "claims supervisor" may generally be described as performing a "sedentary" occupation, automobile damage field claims adjusters, managers, and supervisors engage in an occupations that require driving and travel. CIGNA's consideration of "any occupation" for Desiree Johnson, one that must include her prior occupations for GEICO, her only work experience after school, required an understanding of what her occupations had been for years. With necessary duties of travel and driving, among other physical and intellectual demands, it was not reasonable to review Desiree Johnson's work capacity without understanding those expected demands of employment in "any occupation."

9.  CIGNA's new, mischaracterization of work capacity

CIGNA decided in August 2013 that an alternative occupation that Desiree Johnson would have capacity to perform would be in her own occupation as a "claims supervisor." AR 0623. See "Transferable Skills Analysis ("TSA")" of August 8, 2013. CIGNA declared that the

position of claims supervisor was her "own occupation." AR 0623. Importantly, CIGNA *assumed* that Desiree Johnson could "occasionally" lift and carry 11 to 20 pounds, climb stairs, stoop, kneel, and crouch, etc. CIGNA speculated that she could "frequently" carry up to 10 pounds and push and pull up to 25 pounds. AR 0622.

CIGNA *assumed* physical and intellectual capacities, but CIGNA did this without considering the impact of pain known to cause her loss of function. CIGNA's "analysis" was nothing more than a broken circle of false logic. In effect, CIGNA felt that Desiree Johnson could be fully employed in her regular occupation based upon an assumption (by Dr. Thurston) that she had physical capabilities. CIGNA contradicted the evidence and CIGNA's own findings. For 24-consecutive months she did not have the physical and intellectual capabilities due to the impairments resulting from her health problems, primarily TN. CIGNA's TSA used unwarranted assumptions. CIGNA conducted no "analysis" at all.

CIGNA asserted that it relied upon the "IME" by Dr. Thurston dated July 24, 2013. AR 0274-75, AR 0626-30. In turn, CIGNA relied upon its PAA of July 30 and its TSA of August 8. Each was built on speculative opinions by Dr. Thurston. AR 0275. Also, while CIGNA "recited" that it relied upon its "review" of the SSDI benefits decision, nothing about the SSA's decision supports the physical and intellectual capabilities that were assumed by CIGNA. CIGNA's denial also reveals it was generated from the insurance company's form-denial template. AR 0275. This is shown by the recitation in the letter: "this review confirmed that you would be able to perform the following occupations: [**list out alternate occupations that meet the indexed covered earnings wage threshold and all other policy requirements for AnyOcc**]." AR 0275 (emphasis in original). Following that direction, CIGNA listed the type of verbiage that CIGNA wanted stated in its scripted denial by reciting:

"…--job title- DOT Code #dot #

– – job title – DOT Code #dot#."

AR 0276.

Supposedly fitting occupations were **not** recited in the letter <u>under</u> those standard directions. AR 0275-276. CIGNA added scripted verbiage: "the above identified occupations are compatible with your work capacity." Carelessly, CIGNA had recited transferable skills for positions of "supervisor, claims and "customer service representative supervisor," but did so *above* the directions found in its denial template (not below them as the form directed.) Instructional verbiage was left in the letter.

The denial letter reveals CIGNA's reviewer was set up to generate CIGNA's routine denial rationale. The form prompted a recital of supposed alternate occupations within "work capacity."

CIGNA used its template to tell Desiree Johnson that she no longer met the definition of disability. CIGNA said her claim was "closed" <u>because</u> she could do such jobs on a full-time basis. But, those jobs require functional capacity that for two years CIGNA said she did not have. Nothing had changed for Desiree Johnson.

CIGNA added to its irrational denial by referring to the SSDI award as if it was considered "in our claim review." AR 0276. Reciting that the SSDI award was considered does not make that a reality. CIGNA attempted to justify its rationale by stating confusingly that there was no "new information" in "your SSA file." CIGNA explained nothing to justify its disregard of the SDSDI award. See, *Glenn, supra.*

This reveals that CIGNA carried out its pre-determined cut off. CIGNA attempted to justify this with language to satisfy ERISA precedent. CIGNA could not explain how

information in the SSA file was meaningfully considered. The "rationale" for ignoring the SSDI award makes no sense.

Desiree Johnson's debilitating impairments had not changed, but, in fact had worsened.

10. <u>Bias by CIGNA is demonstrated</u>

The bias of CIGNA is demonstrated in the AR. CIGNA ignored evidence without any reasonable basis. CIGNA's abuse of discretion is the equivalent of arbitrary action. CIGNA's arbitrary action reveals CIGNA's bias. CIGNA preferred its financial resources over its obligation to act solely in the interests of the Plan participant, Desiree Johnson. 29 USC § 1104.

Dr. Thurston stated to CIGNA that "to prepare for the examination and report, 1 1/2 inches of provided medical records were reviewed." AR 0626. But, during the exam, Dr. Thurston did not express any familiarity with those records. AR 0385, par. 9, p. 4.

Dr. Thurston said his exam of Desiree Johnson was "independent." AR 0626. Yet, during the exam, Dr. Thurston belittled Desiree Johnson. He minimized her reported symptoms. AR 0385, par. 9, p. 4. He said he didn't think she had TN. At the same time he told her he had no familiarity with TN. *Id*. He told her she "faking." *Id.* He said, rather than pain problems, she was experiencing "depression." Dr. Thurston scrutinized a list of medicines to say what he thought they were for as opposed to what they were actually designated for by her doctors. *Id*. Desiree Johnson described numerous symptoms and impairments. She described hand cramping and left arm and left hand numbness from cervical DDD. She described the cramping as lasting for about 30 seconds in each episode. Showing his adversarial approach, Dr. Thurston told her hand cramping would not be problematic. *Id*.

Dr. Thurston speculated that she had work capacity because she drove herself to the interview and pulled his door closed. AR 0386, p. 5. Dr. Thurston said that she could handle 10

to 20 pounds (and occasionally push and pull 25 pounds), yet Desiree Johnson showed that she could not do that on even an occasional basis. AR 0386, p. 5.

Dr. Thurston suggested there was no evidence of upper extremity radiculopathy. *Id.* Nevertheless, the records show numbness in her left arm as evidence of radiculopathy due to cervical DDD. *Id.*

Dr. Thurston said Desiree Johnson had received limited relief from nerve blocks so that would explain why the doctors did not "believe" her. Yet, that was never indicated by them or in the medical records. Dr. Thurston invented the idea.

Desiree Johnson was upset by the insulting and accusatory approach of Dr. Thurston. He said that she exaggerated, but he offered nothing to support that accusation. AR 0622-23. The records demonstrate that she did not exaggerate her pain or impairments. Dr. Thurston did not take meaningful account of the impact of pain, fatigue and diminished cognitive abilities to function in competitive employment. AR 0386, p. 5.

Further bias is revealed. CIGNA's Dr. Graham placed phone calls to healthcare providers as supposedly part of his "peer" review. He obtained no information, because no one was available when he called. AR 0442. On other occasions, CIGNA's reviewers said doctors were not available, yet the reviewers arrived at their opinions without real input. AR 0371.

Allsup assured Desiree Johnson that it would "act in your behalf" and "in your best interests." AR 0397. As a fiduciary, this would not mean unilaterally sharing information with CIGNA to prompt collection action against Allsup's client.

CIGNA utilized Todd Graham, but then expressed a desire to avoid him. CIGNA said there was a need for a neurological examination and pain management review, and evidently, CIGNA realized it did not seek that meaningful information. AR 0376-378. Yet, CIGNA cited

Todd Graham, who concluded, without any basis, that there was no "objective" evidence. AR 0443-449.

Throughout the claim, CIGNA recited its mission to "help" its insured. E.g., AR 0376. CIGNA cited its commitment to "good faith." AR 0392. Also, CIGNA established its Code of Ethics to assure customers like Desiree Johnson of its fair and reliable services. A publically available copy is attached in the Appendix, and judicial notice is request for this public, undisputed document. FRE 201.

CIGNA's Lloyd Thurston made note of pain, but then he ignored it, as he did with facial swelling and left-arm numbness. AR 0627, 0669.

CIGNA assured Desiree Johnson it would not give deference to its prior reviews and that it would provide her meaningful evidence. AR 0238. CIGNA told Desiree Johnson that ERISA required her to "go through the company's administrative appeal review process prior to pursuing any legal action challenging our claim determination." AR 0280. CIGNA told Desiree Johnson that she could submit additional information, including medical records that would cover the period of August 1, 2013 to the present. *Id.* CIGNA said that CIGNA would be "pleased with any information you may wish to submit." AR 0281. CIGNA assured Desiree Johnson that she was entitled to receive information "relevant to your claim for benefits." AR 0256.

When CIGNA affirmed its denial on August 4, 2014, CIGNA did not reveal the name of its reviewer. CIGNA stated that "to clarify your client's functionality, we referred the file for an independent medical review by a board-certified physical medicine and rehabilitation and pain medicine position. The physician reviewed all of the medical documentation contained in Ms. Johnson's claim." AR 0255. This turned out much later to be Todd Graham, who is not a neurologist. He did not have qualifications to opine about neuropathic pain. CIGNA recited that

"we are in receipt of more recent information that [sic] the Social Security Administration had to consider at the time of its decision." Given the timing of SSDI benefits, it is confusing to deal with this statement from the CIGNA. AR 0255. Whether what may be called "new" information was available, the health impairments continued to impaired Desiree Johnson.

CIGNA's first appeal denial relied upon the IME from July 2013. CIGNA emphasized that "the reviewer notes that the patient complained of side effects of almost every medication attempted which made compliance with medication regiment [sic] very difficult." AR 0255. Whether a patient experiences side effects is not a reason to assume that conditions do not exist.

Notwithstanding its concurrent assurance that it did not defer to its previous reviews (AR 0238), in the appeal denial CIGNA declared, "your client underwent an independent medical evaluation on July 30, 2013 indicating that her symptoms were significantly exaggerated and self-reports of pain were inconsistent with clinical findings." AR 0238. Thus, CIGNA relied on Dr. Thurston.

CIGNA noted headaches and pain affected her functionality, but CIGNA argued that there were "no clinical findings that would reasonably result in functional impairments. Furthermore, there was no evidence of any cognitive impairment based on the documents reviewed." This (AR 0238) contradicted CIGNA's acceptance of the substantive evidence, and the fact that pain, such as her facial pain and headaches, is, by its nature, "subjective," and that cognitive impairments were reported in the clinical records.

CIGNA first recorded that there had been a diagnosis of cervical "radiculopathy," but then CIGNA argued there was "no documented progress in neurological deficits consistent with radiculopathy." That observation was false given the MRI showing Degenerative Disc Disease in her cervical spine and persistent left arm numbness (cervical radiculopathy).

CIGNA's ultimate appeal denial confirmed the diagnosis of TN with necessary multiple injections, including infra-orbital nerve blocks, since 2010. AR 0238. But, CIGNA then unreasonably declared that "although, she has self-reported limitations despite ongoing treatment this does not result in impairment. There were no significant neurological deficits." Thus, contrary to the evidence, CIGNA declared that pain could not, categorically, result in impairment. CIGNA even argued that there had been "no" further workup such as "aggressive medications management or even neurosurgical consultation if her symptoms were so significant." AR 0238. This demonstrates again the pre-determined motivation to cut off benefits.

11. Procedural unfairness

Unlike in prior denials, in the final appeal denial CIGNA revealed that it had consulted with David Hoenig, M.D. and Jamie L. Lewis, M.D. AR 0238. Despite CIGNA's promise to provide meaningful information and full and fair review, as required by ERISA, CIGNA did not share their reports. They were seen only after the start of this case.

During the 1st appeal CIGNA promised that it would conduct an "independent" peer review. AR 0259. CIGNA assured Desiree Johnson that its purpose was to "ascertain that you have the opportunity to submit anything that you feel is relevant to your appeal." AR 0268. By regulation, 29 CFR § 2560.503-1, CIGNA was obligated not to defer to previous reviews. See, also, AR 0238.

Despite fiduciary duties, CIGNA acted contrary to Desiree Johnson's rights. For example, with the 2nd appeal CIGNA said that it was "unable to accept" the appeal because, in CIGNA's mind, it was not "time concurrent for the period of review." CIGNA **returned the appeal**. AR 0251. CIGNA said that "we are not accepting the submitted information as an appeal." AR 0248.

CIGNA falsely stated that it had not received its medical authorization release (MAR) form from Desiree Johnson. CIGNA delayed for almost a year in giving her the file. CIGNA argued inconsistencies (AR 622-23, 626-30), but there were none (AR 382-87). Dr. Hoenig confirmed with Dr. Bakanauskas that severe pain was debilitating, but then he called incapacitating pain merely "subjective" to suggest it could be ignored.

Similarly, CIGNA relied upon Jamie Lewis of MLS, who relied on Dr. Thurston to conclude there were "no supported objective medical findings." AR 0369. CIGNA ignored the fact that the pain conditions typically are not identified with "objective" signs.

Speculative opinions by Dr. Thurston about pressured speech, opening a door, sitting and arising from an exam table, giving what he called suboptimal effort, talking, acting in a tearful manner, and describing her difficulties from many symptoms and her loss of career, showed biased "reasoning."

12. Earnings and LTD benefits

Desiree Johnson's earnings have been misapplied by CIGNA. The pay records from GEICO include late 2010 and early January 2011. The last available statements from early January 2011show the most recent (and correct) pay-rate per hour, but use an assumption of "sick pay" hours applicable after her leave started (around December 10, 2010). This reflected lower-than-the-correct actual work hours. Using the amount of pay recited in GEICO earnings statements, such as $3,145.12 per pay period, with 26 pay periods per year, then annual earnings were at least = $81,773.12. With that, BME = $6,814.44 per month and gross LTD benefits per month at 2/3 = $4.542.95. AR 1062.

This provides a minimal and more realistic and fair BME. It is greater than that used by CIGNA for LTD benefits of $78,390 per year, which resulted in LTD benefits paid at $4,355 per

month, using 2/3 x BME per the Policy. AR 1059. CIGNA *under-paid* LTD benefits by at least $4,542.95 less $4,355 = $187.95 + per month.

In its analysis, CIGNA used an assumption of $78,390 per year and multiplied that by 80% to compare occupations. AR 0622. CIGNA also cited $6,250.03 per month or $78,000 per year. AR 025. See also AR 1055.

The evidence provided by GEICO shows that Desiree Johnson earned about $83,500 per year at the time of her disability. AR 0383. Desiree Johnson confirmed this. AR 382-87, p. 2, par. 5, (AR 383).

The payroll statements support Desiree Johnson's position. AR 0383, 1059, 1062, 1065. Earnings of at least $81,773 per year should be used. The **LTD benefits calculations** indicate:

> BME: $81,773 per year =$6,814.44 per month x 2/3 = $4,542.94 LTD per month
>
> Less SSDI benefits: Primary $2,052 + dependents $1,026 = $3,078 per month
>
> Net LTD benefits = $1,464.94 per month from 6/9/2011 until May 1, 2017, when
> Dependent SSDI benefits of $1,026 per month cease
>
> Net LTD benefits = $4,542.94-$2,052 = $2,490.94 per month from May 1, 2017 –
> Until age 65, and with DOB = 5/27/1967, so age 65 is at 5/27/2032
>
> LTD benefits paid by CIGNA from 6/9/2011- 3/31/2013 at $4,355 per month =
> 21.7 months x $4,355 = $94,503.50
>
> LTD benefits due for 6/9/2011-3/31/2013, at $1,464.94 x 21.7 = $31,789.20
>
> LTD benefits overpaid as of 3/31/2013: $94,503.50-$31,789.20 = $62,714.30
>
> Credit for unpaid LTD benefits from 4/1/2013- 10/24/2016, 42.81 months x
> $1,464.94 per month = $62,714.30
>
> Overpaid LTD benefits: paid off by credited benefits by no later than 10/24/2016
>
> LTD benefits accrued: 10/25/2016- 2/28/2017, $1,464.94 x 4.19 months =
> $6,138.10
>
> LTD benefits to accrue 3/1/2017 - 4/30/2017 at $1,464.94 x 2 = $2,929.88
>
> LTD benefits to accrue: 5/1/2017 e seq., at $2,490.94 per month for 16 years.

13. <u>Key facts on appeal were verified in the AR.</u>

A significant summary appears in the appeal letter of March 17, 2015. AR 388-426, verified by Desiree Johnson. AR 0382-87, par 3, p.1. CIGNA promised to assist Desiree Johnson. AR 0392. The Summary Plan Description (SPD) cited CIGNA's commitment:

> "Disability insurance provides individuals and their families for financial protection. The disability insurance benefit described in this certificate will help secure your family's financial security in the event of your disability. The need for disability insurance protection depends on individual circumstances and financial situations. Your employer is offering you the opportunity to participate in this insurance plan to make your benefit program more comprehensive and responsive to your needs." AR 392 – 93.

CIGNA declared its mission: "to help people we serve improve their health, well-being, and sense of security." AR 393. CIGNA's SPD stated that "Any medical and vocational experts consulted by the Insurance Company will be identified." AR 388-426. CIGNA failed in its promises.

Also, as emphasized in that appeal correspondence, in May 2014, Egle Bakanauskas, M.D., supplied clinical evidence showing her lack of functional abilities. He medically confirmed loss of capacity due to neck pain, cervical radiculopathy, left arm pain, and TN. He confirmed the prominence of left hand and arm numbness and pain; and fatigue, constant face and neck pain and left upper extremity problems. He clinically declared to CIGNA: She could not effectively use a telephone to communicate; she could not read very small print; she could not read ordinary newspaper or book print on an extended basis; and she could not work on the computer screen on an effective and extended basis. He explained that she had diminished visual capacity because of pain. And, he specifically observed her "optic nerve damage to the left eye." AR 0396, 594-599. Contrary to CIGNA's observations, Dr. Bakanauskas confirmed, Desiree Johnson was "unable to concentrate due to pain, vision changes, and face and neck pain." AR 594-599.

She emphasized (AR 0397), Allsup had assured her of its Fiduciary Responsibilities:

> "Allsup's core services of Social Security representation helps you qualify for SSDI benefits… We will serve as your advocate, and will do everything we can to qualify you for SSDI benefits.… We assure you that we will: always represent your interests. We never share your medical information with anyone other than the SSA unless you authorize us to do so or we are required to do so by law." AR 397.

Contrary to this assurance, Allsup immediately reported to CIGNA about an overpayment collection potential.

As shown to Allstate by Dr. Bakanauskas, Desiree Johnson did not have the capacity for even occasional lifting of 10 pounds, a minimum requirement for even "sedentary" employment.

Desiree Johnson stressed CIGNA'S record:

AR 399-413. For Example, CIGNA had stated:

> "… Claimant must drive to review work of auto adjusters. Check in on auto adjusters to confirm level of work, and conduct ride along with the Adjusters to train them. As such, the claimant confirmed Trigeminal Neuralgia, which causes electric-like spasms in the face and surface of the eye, that will prevent claimant from operating a motor vehicle…" AR 0409, citing CIGNA claim file, March 29, 2012. Also, AR 125 (CIGNA's, p.73 of 183).

CIGNA even repeated in its notes of August 8, 2013 the evidence for recommending approval of LTD benefits based upon:

> "…Diagnosis of Trigeminal Neuralgia and peripheral neuropathy. Treating with neurologist for infra-orbital nerve blocks and mental nerve blocks. Claimant is taking class III narcotics for pain control. Symptoms of slurred speech and hands are curved similar to stroke. Claimant is working with Allsup– MRI dated 12/29 shows positive findings for C-5-6 and is treating with cervical PT…" AR 0409-410

In the same appeal correspondence of March 2015 (AR 0388-426), Desiree Johnson confirmed the ongoing neurological evaluations, including reports of Chantal M. O'Brien, M.D., Neurology, University of Colorado Health. Dr. O'Brien adjusted medications for TN, cluster headaches, and insomnia and described chronic TMJ pain. Dr. O'Brien clinically observed that Desiree Johnson had tried all recognized preventative steps. AR 412.

Additional details about the interview by Dr. Thurston were provided. AR 416. Dr. Thurston stated that there was nothing wrong with her and "why does your family have to do everything?" For example, when Desiree Johnson explained factors that would trigger face, ear, and neck pain, such as talking on the phone, Dr. Thurston said "I thought all women liked to be on the phone?" AR 0416.

This demonstrated that CIGNA was determined through its own routine to cut off benefits when the definition of disability went from "own occ" to "any occ." AR 0418.

It is evident that CIGNA accepted evidence to pay benefits. When CIGNA chose to cut off benefits in connection with a change in definition of disability, CIGNA chose to treat pain as if it would not ever matter. CIGNA ignored substantial evidence, cherry-picked "evidence" that might support a cutoff decision, acted without substantial reason, conducted decision-making in an arbitrary and capricious manner, and abused its discretion. CIGNA demonstrated its bias against its insured. CIGNA's conflict of interest influenced its decisions. And, the Regulatory Settlement Agreement (RSA) from the spring of 2013, coupled with cases in which CIGNA abused its discretion are factually relevant on two points:

(i)     Whether the pending discovery is likely to produce evidence the Court will need for judicial review about biased-claims administration; and

(ii)    Whether the RSA demonstrates a history of bias because CIGNA promised to pay over $1 million in fines and up to $70 million in benefits based on activities under the supervision of insurance regulators.

**F. ARGUMENT**

1.  While the standard of review should be *de novo*, the record also shows that CIGNA acted without substantial evidence.

-40-

Based on Colorado insurance law, CIGNA's argument that a reservation of "discretion" in the Policy issued in 2007 should control for claims decisions in 2013-2015, must be overruled. CIGNA has declared that "the claim and appeal determinations at issue in this case" were made in the period of 1/1/2013 to 5/31/2015. (See, Defendant's Answer to Inter. # 4, May 26, 2016, p. 14.) Like other jurisdictions, Colorado has adopted insurance law to protect employees and plan beneficiaries from abuses of discretion. The 6th, 7th, and 9th circuits, as well as district courts, including this Court, have rejected the argument that ERISA preemption should defeat such laws. Instead, these state laws that are saved from preemption. See *Fontaine v. Metropolitan Life Insurance Co.* 800 F. 3d. 883, 885 (7th Cir, 2015); *Standard Insurance Co. v. Morrison*, 584 F. 3d. 837 (9th Cir, 2009); *American Council of Life Insurers v. Ross*, 558 F. 3d. 600 (6th Cir, 2009); and *Arapahoe Surgery Center, supra*.

The Colorado law, § 10-3-1116 (2), C.R.S., as amended in 2008, negates a reservation of discretion in a disability policy and is a law that "regulates insurance." It is specifically directed toward entities engaged insurance. It substantially affects the risk-pooling arrangement between the insurer and the insureds. *Kentucky Association of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342, 123 S. Ct. 1471, 155 L. Ed. 2d 468 (2003). "Voiding" a reservation of discretion in a disability policy has nothing to do with ERISA's civil enforcement scheme. There can be no implied preemption. See *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004). The Colorado law does not duplicate, supplement, or supplant an ERISA civil enforcement remedy. It restores ERISA's own default rule of *de novo* review in cases challenging denials of health and disability benefits. It is not preempted.

In the alternative that the arbitrary and capricious standard of review is found to apply, the evidence shows that CIGNA acted without substantial evidence.

The Court should reverse a denial of benefits if it is not supported by substantial evidence, the fiduciary's construction of policy language is unreasonable, or the decision was made in bad faith. *Mason v. Reliance Standard Life Insurance Co.,* 2015 U.S. Dist. LEXIS 132843,*9, 10, 11 (D. *Colo., September 30, 2015),* citing *Graham v. Hartford Life and Accident Insurance Co.,* 589 F. 3d. 1345, 1357 (10th Cir. 2009). For arbitrary and capricious review, a determination need not be the best or only logical resolution, but it must be reasonably supported by the record. *Nance v. Sun Life Assurance Co.* 294 F. 3d. 1263, 1269 (10th Cir. 2002). The Court should consider whether the plan fiduciary's interpretations are reasonable and whether, under a requirement of principled decision-making, the fiduciary had substantial evidence and reasonably considered it. See, E.g., *Oliver v. Coca-Cola Co.* 497 F. 3d. 1181, 1195-99 (11th Cir, 2007). The decision must be "predicated on a reasoned basis." *Adamson v. Unum Life Insurance Co. of America,* 455 F. 3d. 1209, 1212 (10th Cir. 2006).

In the 10th Circuit, the arbitrary and capricious standard of review is synonymous with the abuse of discretion standard of review. *Loughray v. Hartford Life Insurance Co.* 366 Fed. Appx. 913, 923 (10th Cir. 2010).

"ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber co. v. Bruch* 489 U.S. 101, 113, 109 S. Ct. 948, 1030 L. Ed. 2d 80 (1989). When the plan insurer ignores the impact of known health impairments (e.g., pain) on the insured's ability to perform full-time employment, or when the plan insurer discounts, ignores, or fails to reasonably consider material evidence of health impairments, or when the plan insurer makes speculative, unwarranted, or unreasonable assumptions about work capacity, its decision to uphold its own denial will be found to be an abuse of discretion. Such a decision would not lie "anywhere on the

continuum of reasonableness." *Loughray*, 366 Fed. Appx. 923. See *Mustain-Wood v. Northwestern Mutual Life Insurance Co*. 938 F.Supp.2d 1081, 1088-1089 (D. Colo. April 4, 2013). There the court also observed that § 10-3-1116 (2), CRS, as amended, would not be applied to a disability benefits claim because renewals of coverage following the effective date of the Colorado insurance law (2008) were not considered sufficient to make the law applicable to a policy issued in the 1990s. Plaintiff respectfully disagrees with that holding. But, considering the approval of disability benefits here between 2011 and 2013, the cutoff of benefits in 2013, and the appeal denials in 2014 and 2015 in this case, the Court should find here that the 2008 law does apply.

When discretionary authority applies, a plan insurer's decision will be upheld only if "it is the result of a deliberate, principled reasoning process, and if it is supported by substantial evidence." *Glenn v. Metropolitan Life Insurance Co*., 461 F.3d. 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of America Health and Retirement Funds*, 929 F. 2d. 1140, 1144 (6th Cir, 1991)); and see, *Cox v. CIGNA Group Insurance*, 2010 U.S. Dist. LEXIS 17164 (E.D. Ky., February 24, 2010). A court's review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *DeLifle v. Sun Life Assurance Co. of Canada*, 558 F. 3d 440, 446 (6th Cir. 2008).

In this context, CIGNA's decision must reflect meaningful analysis and not a failure to reasonably consider the evidence. While the arbitrary and capricious standard is deferential, it is not a rubber stamp for the administrator's determination. *McDonald v. W.-F. Life Insurance Co.*, 347 F. 3d. 161, 172 (6th Cir. 2003).

A lack of substantial supporting evidence is an indicia of arbitrary and capricious conduct for the purpose of 29 U.S.C. § 1132 (a) (1) (B). Also indicating arbitrary and capricious conduct

is "bad faith" conduct. It shows the influence of the conflict of interest affecting the plan insurer. See *Clausen v. Standard Insurance Co.,* 961 F. Supp. 1446, 1453 (D. Colo. 1997).

CIGNA did not provide or have a reasoned explanation for its termination of benefits. It was unreasonable for CIGNA to suddenly ignore debilitating symptoms that it accepted for 24 months. CIGNA attempted to create a "reason" by relying upon Lloyd Thurston. However, Dr. Thurston was overtly adversarial, not independent, not a neurologist, and not reasonable. He ignored significant evidence of clinical treatment for TN and chronic pain.

He argued with Desiree Johnson, creating a notion that she was not believed by her physicians. He openly admitted that he had not reviewed the records that stood before him on the table, even though he told CIGNA that he had already reviewed those papers before seeing Desiree Johnson. He tried to humiliate her by declaring she did not want to work and would not be willing to help her family. He failed to make a meaningful recognition that she was tearful in discussing the debilitating effects of TN, especially as it meant constant pain and the loss of her career of 23 years with GEICO. Under his rubric of a supposed lack of "objective" physical findings, Dr. Thurston turned a blind eye to the meaningful effects of pain on work capacity.

CIGNA attempted to manufacture support for its cutoff by having records reviewed by its consultant, Todd Graham. CIGNA later tried to distance itself from Dr. Graham. His report from August 2014, reveals that he relied upon speculation by Dr. Thurston, such as a supposed absence of "objective" findings.

CIGNA failed to have a neurologist examine Desiree Johnson. With its late review by David Hoenig in May 2015, CIGNA attempted to fill the gap of no input from a neurologist. Her TN had been treated for over five years by neurologists and pain management specialists. Dr. Hoenig reveals that he used observations by Dr. Thurston and resorted to insurance company

verbiage of a supposed lack of "objective" findings. Notably, and unlike the prior reviewers, Dr. Hoenig did recognize extensive medical evidence of significant pain and impairment due to TN. Nevertheless, Dr. Hoenig agreed with CIGNA by ignoring pain.

CIGNA did not engage in "principled decision-making."

2.  <u>The bias of CIGNA toward Desiree Johnson shows that CIGNA abused its discretion and CIGNA's cut-off of LTD benefits should be reversed.</u>

As shown by the AR, as cited above and making use of Plaintiff's "Index" to the AR (attached in the Appendix to this Brief), CIGNA exhibited bias. "Bias" can be considered shorthand for the concept that CIGNA's conflict of interest influenced its decision-making. CIGNA does not dispute its dual role and the presence of the conflict of interest, but CIGNA argues in discovery that there was "absolutely" no influence.

To assist the Court in recognizing the evidence of bias, Plaintiff presents <u>CIGNA's words</u> from the AR:

> "3/29/12 Cx [claimant, Desiree Johnson] must drive to review work of auto adjusters, check in on auto adjusters to confirm level of work, and conduct ride along w/ adjusters to train them. As such, due to cx's confirmed trigeminal neuralgia, which causes electric-like spasms in the face and surface of the eye, will prevent cx from operating a motor vehicle. Cm [Case Manager] 2f/u [follow up] for status of tx [treatment] in six months to confirm if seizure activity has ceased.…
> 1/24/2012 – staffed updated meds w/ NCM [Nurse Case Manager], will request R&L's from ENT provider and verify with GEICO if cx's job requirement is to drive. Once info is received will re-staff with NCM for ongoing direction, CM Rec [recommends] approval. Cx Trigeminal Neuralgia and Peripheral Neuropathy. Txtg [treating] with Neuro for infraorbital nerve blocks and mental nerve blocks. Cx is taking class III narcotics for pain control. Symptoms of slurred speech and hands are curved similar to stroke. Cx is working with Allsup. Cm will FU in three months and re-staff for direction with NCM/VRC [vocational rehabilitation counselor] if necessary."
> … "Secondary – MRI dated 12/29 shows positive findings for C5-6 M is treating with cervical PT.
> 43 yof auto damage field supervisor, S[sedentary] Occ [occupation] [sic] out on disability for facial nerve damage, back/neck pain, and HTN. LDW [last day of work] is 12.13.10. Cx states she has had trigeminal nerve damage issues in her L side of face for the past two years. She went out of work because the pain got so bad that her medications make it

hard to function at work…" AR 0125 (CIGNA claim file, computer notes or "Acclaim").

CIGNA exhibited its willingness to review, understand and accept (for the most part) the overwhelming evidence of debilitating impairments. Those impairments resulted in the loss of functional capacity for Desiree Johnson. She has been unable to perform the material duties of her job and they precluded her from doing any job. Then, CIGNA ignored the evidence when it reversed itself.

CIGNA took this approach because it had developed, institutionally, its practice to perform its "any occ. investigation," so CIGNA could take advantage of the more difficult burden for an employee to establish disability from "any" occupation. See AR 164, where CIGNA stated that its "any-occ." investigation started. At that time CIGNA also clearly declared a mental condition did not "exist on this claim," and that a "physical condition" did exist on this claim. CIGNA recorded that Desiree Johnson was treating every three months for nerve blocks and that her medical condition "continues to support" the payment of LTD benefits. CIGNA reviewed nerve blocks and chose to accept that treatment as clinical evidence of her ongoing impairments. *Id*.

CIGNA argues in discovery that it "walled off" its claims decision makers from business people and that saving CIGNA money has played "absolutely" no role. See, Defendant's Answer to Inters. # 3, #5 (pp. 18-22), and #6 (p. 20), and denial of Req. for Adm. #3 (p. 33), May 26, 2016. CIGNA's insistence that its claims decision makers had no awareness that they were saving CIGNA money by their denials is not worthy of belief.

CIGNA elevated its concern with "any occupation" over the evidence. CIGNA treated the "change in definition" of "disability" as if that allowed CIGNA to ignore and minimize evidence.

CIGNA acted to the contrary to the known interests of its insured customer and violated its fiduciary duty under 29 U.S.C § 1104 (a) (1).

   3.   CIGNA has a history of biased-claims administration as shown by the evidence, the money paid to its reviewers, CIGNA's Regulatory Settlement Agreement (RSA), and case law.

CIGNA rewarded Dr. Thurston and Dr. Hoenig with more assignments. This contradicts CIGNA's assertion in discovery that CIGNA neutrally allows a vendor to pick a reviewer. (CIGNA "… does not control the roster of reviewers," See, Defendant's Answer to Int. #3, pp 9-12, May 26, 2016.) In the year of his review about Desiree Johnson, 2015, David Hoenig did 27 reviews for CIGNA and they paid him over $17,000. (CIGNA has not yet disclosed its use and compensation of Dr. Hoenig in 2016.) While CIGNA's full interactions with Dr. Hoenig and others have not yet been detailed (subject to the pending Objection), the rewards demonstrate that Dr. Hoenig was not "independent," as is also true with Dr. Thurston.

The lack of independence violates the obligation of CIGNA to provide Desiree Johnson full and fair review under ERISA, 29 U.S.C § 1133, and regulations for appeals. Under 29 C.F.R. § 2560.503-1(h) (3) (ii), CIGNA was required to provide but it did not provide a review that did not afford deference to the initial adverse benefit determination. *Id;* and AR 0238.

While CIGNA has neglected to place a copy of the Summary Plan Description (SPD) in the AR, pertinent provisions were summarized in Plaintiff's appeal correspondence verified by Desiree Johnson. See the Appendix and AR 382-87 (Affidavit) and 388-426 (verified details in appeal correspondence).

While Dr. Hoenig apparently did not have a role in the prior review, his report reflects that he considered and was not independent from observations by Dr. Thurston and Dr. Graham.

An ongoing relationship with an insurer coupled with the insurer's compensation of the reviewers show that the reviewers are not truly independent. *Oster v. Standard Ins. Co*., 759 F. Supp. 2d 1172, 1186 (N.D. CA. 2011). See AR 359-66. While Dr. Hoenig recited facts about the ongoing diagnosis and treatment for TN, he then chose to ignore evidence by declaring that her impairments were "subjective" rather than "objective." Courts have held that it is arbitrary and capricious for a plan insurer to demand "objective" findings of pain when pain conditions (e.g., chronic pain due to TN) are not typically manifested with "objective evidence." See, *Montour v. Hartford Life*, 558 F.3d 623, 635 (9th Cir. 2009); *Austin v. LINA,* 2010 U.S. Dist. LEXIS, 38294, *30 (C.D. CA. 2010)

The Regulatory Settlement Agreement (RSA), submitted to the Court with Plaintiff's Motion to Compel (also see, ECF No. 29-11), demonstrates that CIGNA agreed to pay significant fines and subject itself to compensation of disabled customers to the extent of $70 million. This happened in "settlement" of insurance regulators' charges about CIGNA's unfair claims practices. CIGNA has argued that the RSA is a settlement reflecting no admission of fault. CIGNA has argued that it is inadmissible under FRE 408.

However, the RSA did not result from mere imagination. It represents the results of insurance regulator probes by five states (California, Connecticut, Pennsylvania, Michigan and Maine, with others, including Colorado later joining) where thousands of disability benefit claims have been handled by CIGNA. The RSA is not offered to demonstrate CIGNA's fault or liability in insurance investigations. Instead, the RSA is offered to show the "history" of CIGNA for biased or unfair claims administration. The context shows CIGNA has been preferring its own financial interests despite its fiduciary duties. 29 U.S.C. § 1104 (a) (1).

The California Insurance Department's August 3, 2007 "Public Report of the Targeted Market Conduct Examination of the Claims Practices of Life Insurance Company of North America," as of June 20, 2006 is also attached. This public document should be the subject of judicial notice. FRE 201. It provides a precursor to the RSA. It shows findings of unfair practices. It supports Plaintiff's argument about CIGNA's history of bias. (Follow-up California investigations are also publicly available and describe claims examinations in light of violations described in this report, which called for monitoring.) This public report conflicts with CIGNA's supplemental discovery response stating that it "does not maintain any repository of state regulatory findings" (about LINA having a history of biased claims administration). See, Defendant's supplemental answers to Inters. #5 and #6, pp.4 - 8,

Case law (much of it cited in earlier briefs), also demonstrates CIGNA's history based on findings of its abuse of discretion or arbitrary and capricious conduct. See, Plaintiff's Motion to Compel, Reply in Support, Plaintiff's Motion to Supplement the AR, and Reply in Support.

Plaintiff recognizes that there are decisions where CIGNA was found not to have abused its discretion. At the same time, courts over the last 15 or so years have found abuses of its discretion or compelled more review on remand because of arbitrary and capricious denials of benefits. For a "history" of biased-claims administration, it is not necessary to demonstrate that CIGNA has so acted in every single instance. It should be sufficient, under *Glenn*, *supra*, that CIGNA has chosen, no doubt willfully and with purpose, to deny benefits without substantial reason. CIGNA has placed itself at risk for court rulings that it acted in an arbitrary and capricious manner. Plaintiff respectfully submits that 10 or more occasions demonstrate a history for bias. See FRE 404(b)(2) (prior act evidence is admissible for another purpose such as proving

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.).

The following cases illustrate CIGNA's history of bias. Importantly, the pending discovery responses (see Plaintiff's Objection) should result in additional "history." While CIGNA has not identified a "repository" of bias or influence of the conflict of interest, for wrongful denials of claims, the case law shows many occasions. CIGNA is capable of identifying them.

<u>CASES WHERE CIGNA WAS FOUND TO ABUSE DISCRETION</u>

*Cox v. CIGNA Group Insurance,* 2010 U.S. Dist. LEXIS 17164 (E.D. KY., February 24, 2010);

*Bishop v. Long-Term Disability Income Plan of SAP America, Inc.*, 232 Fed. Appx. 792 (10th Cir, May 7, 2007);

*Rochow v. Life Insurance Co. of North America*, 780 F. 3d. 364 (6th Cir. 2015);

*Macnally v. Life Insurance Co. of North America*, 2009 U.S. Dist. LEXIS 44423 (D. Minn. May 26, 2009);

*Gordon v. Northwest Airlines, Inc. and Life Insurance Co. of North America*, 2009 U.S. Dist. LEXIS 22212, 606 F. Supp. 2d 1017 (D. MN., March 18, 2009);

*Alfano v. CIGNA Life Insurance Co. of New York,* 2009 U.S. Dist. LEXIS 7688 (S.D. NY. 2009);

*Raybourne v. CIGNA* 700 F. 3d. 1076 (7th Cir. 2012);

*Jusznynski v. LINA*, 2008 U.S. Dist. LEXUS 24928 (N.D. ILL. 2008);

*Rao v. LINA*, 100 F. Supp. 3d. 210, 221 (N.D. NC. 2015);

*Barbu v. LINA*, 35 F. Supp. 3d. 274 (E.D. NY. 2014);

*Fourney v. Life Insurance Co. of North America*, 2010 U.S. Dist. LEXIS 121317, 2010 WL 472-2035, p.14 (S. D. WV. November 15, 2010);

*Brandt v. Allina Health Systems LTD Benefits Plan*, 2010 U.S. Dist. LEXIS 58967 (D. MN. 2010);

*Austin v. LINA*, 2010 U.S. Dist. LEXIS 38294 (C.D. CA. 2010);

*Duprey v. LINA*, 632 F.3d 860 (4th Cir. 2011);

*Ward v. CIGNA Life Insurance Co. of NY*, 776 F. Supp. 2d 155 (W.D. NC. 2011);

*Theis v. LINA*, 2011 WL 3624673 (W.D. KY. August 17, 2011);

*Demaree v. LINA*, 789 F. Supp. 2d 1002 (S.D. IN. 2011);

And, see, www20.insurance.ca.gov/epubacc/REPORT/106849.htm (CA Ins. Dept., report of unfair claims practices).

Plaintiff recognizes *Neubert v. Life Insurance Co. of North America*, 2014 U.S. Dist. Lexis 98789 (N.D. OH. July 21, 2014), where the court initially found that CIGNA had acted in a capricious manner, but then, after added review, found in favor of CIGNA.

Plaintiff respectfully submits that the facts support the inference of bias.

4.  The Court should rule that CIGNA is required to respond to the remaining discovery about its conflict of interest and procedural irregularities, and to admit the facts that are not disputed.

As set forth in greater detail in the Motion to Compel and in Plaintiff's Objection, CIGNA should provide meaningful evidence that is relevant under *Glenn*, *supra*. While there are sufficient facts from the known record, the RSA, and the reported decisions involving abuse of discretion by CIGNA, the expected discovery responses should provide material evidence.

5.  The Court should order the Administrative Record to be supplemented with the discovery responses and other materials.

As more fully set forth in Plaintiff's Motion to Supplement the Administrative Record, the discovery responses, the anticipated discovery responses, and additional materials (e.g., the RSA), should be deemed part of the AR. CIGNA's oversight in failing to include the Summary Plan Description (SPD) should also be corrected.

6.  CIGNA failed to provide full and fair review in violation of ERISA, 29 U.S.C. § 1133.

CIGNA utilize an unqualified reviewer for its "IME" in July 2013. Dr. Thurston is not a neurologist. He expressed his lack of familiarity with the primary diagnosis and his showed hostility.

CIGNA committed other procedural irregularities during review. CIGNA "returned" the appeal to Desiree Johnson. CIGNA unfairly concealed the names of its initial reviewers. And, in the final review in May 2015, the reports of later reviewers were unavailable. Any new rationale they added in May 2015 would further show arbitrary and capricious conduct by CIGNA. *Sterio v. HM Life*, 369 Fed. Appx. 801, 805 (9th Cir. 2010). CIGNA cited observations of Todd Graham who reported about clinical evidence and significant nerve blocks, but then concluded, without basis, that there was no "objective" evidence. AR 0443-449.

CIGNA upheld its decision by inappropriately deferring to biased and adversarial observations of Dr. Thurston. See, AR 0238, where CIGNA promised not to defer to its prior reviews. CIGNA withheld the file from Desiree Johnson for almost a year. The unrebutted Affidavit of Desiree Johnson shows that the file was not furnished until February 2015, over a year after it was initially requested with an appropriate authorization. See, AR 382-387. CIGNA

falsely claimed that it had not received a signed medical authorization release form.

Despite prompt action and reasonable submissions by Desiree Johnson, CIGNA failed to act promptly. It took from July 2013 until May 2015 for the review of CIGNA's cutoff decision to be concluded. 22 months is not in keeping with full and fair review or regulations adopted to enforce ERISA. See, § 29 CFR 2560.503-1.

Also, CIGNA cut off of benefits after approving them for 24 months. That raises the procedural issue about whether any evidence of improvement was available. *Montour v. Hartford Life*, 588 F. 3d 633, 635 (9th Cir. 2009). An insurer needs to explain in its claims analysis the reasons why impairments have changed to a point that benefits are no longer payable. *Austin v. LINA, supra,* * 37-38. CIGNA did not do so here.

The Court should also consider the ongoing medical evidence submitted by Desiree Johnson. She recognizes that for the purpose of arbitrary and capricious review the administrative record is generally deemed closed as of the time of the insurer's final decision, here May 22, 2015. Nevertheless, the ongoing treatment is submitted to demonstrate procedural irregularities by CIGNA. CIGNA has refused to consider them. In its cut off, CIGNA ignored many months of treatment, including periodic nerve block injections every 8 to 12 weeks for over five years through specialists such as Dr. Krutsch at University of Colorado Hospital. The fact that Desiree Johnson has continued to receive that needed care is consistent with her ongoing impairments. This illustrates that CIGNA accepted and utilized treatment records showing total disability, but then CIGNA arbitrarily chose to ignore records. The ongoing care is evidence of CIGNA's pattern for ignoring and minimizing critical facts. The consistent treatment after May 2015 is also evidence of ongoing, unresolved health impairments, and is evidence required under the Policy as written by CIGNA.

7.  CIGNA had no basis to cut off LTD benefits after 24 months, and Desiree Johnson
    has been disabled from her own and any relevant occupation.

There is no evidence that Desiree Johnson has improved. Under the case law, the AR demonstrates unreasonableness by CIGNA.

CIGNA has utilized mere records reviews to argue, inappropriately it is submitted, that the evidence has been "subjective" as opposed to "objective." A similar problem was addressed in *Mason v. Reliance Standard Life Insurance Co.*, 2015 U.S. Dist. LEXIS 132843 (D. Colo., Sept. 30, 2015). There a plan insurer argued in reliance on reviewers that evidence should be ignored because it was "not substantiated based on any of the objective medical records." The reviewer had suggested that the employee did not suffer from "significant physical impairments." The court cited *Zhou v. Metropolitan Life Insurance Co.*, 807 F. Supp. 2d. 458, 473-74 (D. MD, 2011) to support its position about evaluating objective vs. subjective facts. Chief Judge Marsha Krieger noted that in *Zhou* the "court concluded that it was not reasonable for an insurer to rely on the fact that there were no acute changes in the claimant's status and that the claimant was described as 'stable,' because this did not necessarily pertain to whether the claimant was able to work." Judge Krieger cited observations that "Mr. Mason's disease was stable and that he did not present objective evidence of somewhat subjective symptoms, such as cognitive problems, a matter relied upon by the plan insurer." *Mason*, at *27, 28. Then, in effect, Judge Krieger determined that the plan insurer had acted without reasonable basis when it discounted the claimant's reports of pain and loss of capacity. As here, Reliance Standard Insurance failed to address the meaningful evidence. The court observed:

> "Reliance's dismissal of evidence of symptoms and limitations experienced by Mr. Mason… was pre-cursory, and the court cannot say that the denial was otherwise supported by substantial evidence. Therefore, for the foregoing reasons, the Court finds

that Mr. Mason has demonstrated that Reliance's denial of benefits is not supported by substantial evidence and therefore was arbitrary and capricious."  *Mason*,* 31.

Desiree Johnson's situation is like that of the employee in *Oliver v. Coca-Cola*, *supra* 1187-88. There, the employee complained of symptoms involving fibromyalgia, shoulder pain, and cervical radiculopathy (even though a cervical MRI was "unremarkable"). The employee's medical records, like Desiree Johnson's, reflected numerous injections for the relief of pain, and the overall condition remained essentially "unchanged." *Oliver* at 1188 – 89.

In *Oliver*, like in this case, the plan fiduciary used "peer" reviews and declared that the insured "must submit objective medical evidence." *Id,* 1190. Similar to CIGNA's conduct, there the plan fiduciary ignored the effects of pain and argued that the medical documentation did not support impairments. Importantly, as is true of the Policy here by CIGNA, the plan in *Oliver* did not require "objective evidence" for the payment of disability benefits.

*Oliver* emphasizes a critical problem. While a plan insurer and its reviewers can sound like they are being "reasonable" by requiring "objective" evidence, for many illnesses it is unclear what "objective" evidence could even be provided. As in *Oliver*, CIGNA's denial of Desiree Johnson's claim for a supposed failure to provide "objective" evidence is arbitrary and capricious because it has been based upon a mischaracterization. A plan insurer must address the effects of pain and the side effects of medication, as CIGNA did before the 24-month disability definition change.

*Clausen*, *supra,* decided in this District in 1997, illustrates this eloquently. Ms. Clausen complained of chronic pain and inability to function. Her insurer suggested "psychiatric overlay." Treating physicians referred to fatigue, muscle pain, nerve irritation, and other factors that compelled Ms. Clausen to stop working. As did CIGNA here, there Standard Insurance scheduled an "IME." Then the insurer and its reviewers questioned whether Ms. Clausen

suffered from chronic fatigue syndrome. Her treating physicians did not. Standard Insurance, like CIGNA, notified Ms. Clausen that there was insufficient "objective medical evidence." As with Desiree Johnson, Ms. Clausen was found by the SSA to be unable to successfully engage in any substantial gainful activity and she was awarded SSDI benefits.

As CIGNA did with its reviewer Dr. Thurston, in *Clausen* Standard Insurance utilized a reviewer to suggest that Ms. Clausen had "exaggerated" her impairments.

Like Desiree Johnson, Ms. Clausen submitted additional medical evidence. She argued that her physicians' diagnosis of chronic pain (identified in her case with chronic fatigue syndrome) had not been refuted by substantial evidence and that her cognitive impairments were shown.

After deciding an arbitrary and capricious standard of review applied, the court in *Clausen* emphasized the substantial evidence of impairments due to <u>pain</u>. The court agreed with Ms. Clausen that the insurance company gave excessive weight to their IME and the subjective opinions of their reviewer. The court found that there was no genuine issue of medical fact regarding the diagnosis, as is the case here for TN.

In *Clausen,* the court observed that the insurer and its reviewer found the impairments of Ms. Clausen to be unreliable. The insurer chose to rely solely on "objective documentation." As a result, Standard Insurance found Ms. Clausen was capable of performing "sedentary work on a full-time basis."

*Clausen* observed that for a plan insurer to look for some sort of conclusive "dip-stick laboratory test" to show that a claimant suffers from a physical disease was inappropriate. It was arbitrary and capricious. *Clausen* found that Standard Insurance was arbitrary and capricious

because it did not address the factors affecting Ms. Claussen's ability to work such as *pain and fatigue.*

A similar issue arose in *Cox v. CIGNA Group Insurance*, *supra*. There, the claimant asserted he was disabled as a result of debilitating back pain. CIGNA, showing the influence of its conflict of interest, utilized reviewers to uphold its denial. CIGNA did so without "meaningful analysis." *Id*. CIGNA essentially dismissed all meaningful evidence by asserting, without explanation, that it did not support impairments to preclude the claimant from working. In *Cox*, CIGNA failed to mention the disability questionnaires and activities of daily living forms that CIGNA had required. *Cox* found that CIGNA had ignored chronic pain and numbness as related to impairments. As the Court should here, *Cox* found that CIGNA had not demonstrated that it engaged in a "deliberate, principled reasoning process," or that its decision was supported by substantial evidence. *Id.*

A similar refusal to consider meaningful evidence arose in *Clarke v. Metropolitan Life Insurance Co.*, 2006 U.S. Dist. LEXIS 87615 (S.D. OH. Dec. 4, 2006). The court reversed the decision of the insurer. The court observed that reviewers' reports relied upon by MetLife did not properly establish that the claimant was capable of gainful activity. That insurer noted, as CIGNA has done here, supposed "inconsistencies" or inaccuracies. The court found (p.12 of 16), that the insurer had inappropriately ignored or not meaningfully considered the impairments resulting from pain and related problems. The court found, on evidence that is similar to that here, that the plan insurer had utilized reviewers to <u>speculate</u> about work capacity. Consistent with the facts here, the court found that there had been no improvement in the insured's conditions. That is the fact CIGNA has chosen to ignore.

      8. <u>CIGNA's decisions were arbitrary and capricious and even in bad faith.</u>

CIGNA suggested that Desiree Johnson could engage in full-time employment as a "claims supervisor." Thus, CIGNA identified the very same occupation that she had performed for many years for GEICO. CIGNA demonstrated its arbitrary conduct and lack of principled decision-making. For example, whether or not driving would be required for a claims supervisor as such a job is performed in the national economy (and it obviously is for a field supervisor), the point is that the evidence has always demonstrated one thing. Desiree Johnson cannot perform in any occupation, such as work she did for GEICO for over 20 years.

CIGNA's decision must be held to be in bad faith.

G.  CONCLUSION

The court should reverse the decisions of CIGNA, award Desiree Johnson LTD benefits, award her interest on past due benefits at the statutory rate in Colorado of 8% per annum, direct CIGNA to resume the payment of benefits, and award expenses and costs for all efforts to recover benefits, including reasonable attorney's fees under ERISA, 29 U.S.C. § 1132 (g).

Plaintiff reserves the right to submit additional briefing after the complete supplementation of the AR and receipt of the outstanding discovery.

Respectfully submitted this 26th day of January 2017.

**BOESEN LAW, LLC**

*s/ Dennis P. Walker*
Dennis P. Walker
*Attorney for Plaintiff, Desiree Johnson*
Boesen Law, LLC
4100 East Mississippi, Ste. 1900
Denver, Colorado  80246
Telephone:      303-999-9999
Facsimile:      303-320-1915
dwalker@boesenlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **PLAINTIFF'S OPENING BRIEF ON THE MERITS UNDER ERISA** was filed and served via the Electronic Court Filing system (ECF) and email on this 26th day of January, 2017, addressed to the following persons:

*s/ Dennis P. Walker*
Dennis P. Walker

Jack M. Englert, Jr., Esq.
Holland and Hart
6380 S. Fiddlers Green Circle, Ste. 500
Greenwood Village, CO  80111
Jenglert@hollandhart.com


cc. Ms. Desiree Johnson, by e-mail