**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-0159-WJM-MEH

DESIREE JOHNSON,

     Plaintiff,

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

     Defendant.

---

## ORDER REVERSING TERMINATION OF BENEFITS

---

In this case brought pursuant to 29 U.S.C. § 1132(a) of the Employee Retirement
Income Security Act of 1974 ("ERISA"), Plaintiff Desiree Johnson ("Johnson")
challenges the decision of Defendant Life Insurance Company of North America
("LINA") to terminate her long-term disability insurance benefits.  (ECF No. 3.)  The
matter has now been fully briefed.  For the reasons explained below, the Court finds
that LINA's choice to terminate Johnson's disability benefits was arbitrary and
capricious.  Johnson will therefore be awarded past-due benefits and reinstatement of
those benefits.

## I.  BACKGROUND

### A.    The Policy

GEICO hired Johnson in September 1991.  (Administrative Record ("R.") (ECF
No. 28) at 230.)  Her last day of work at GEICO was December 13, 2010.  (*Id.*)  As of
that date she was covered by the "GEICO Benefits Program," which included a Group

Long Term Disability Policy, dated October 1, 2007 ("Policy"). (R. at 23–51.) GEICO designated LINA as the claims administrator and fiduciary for the Policy. (R. at 6, 11, 52.) Through that appointment, GEICO delegated to LINA "the authority, in [LINA's] discretion, to interpret the terms of the [Policy]; to decide questions of eligibility for coverage or benefits . . . ; and to make any related findings of fact." (R. at 52.) These decisions and findings are declared to be "final and binding on Participants and Beneficiaries of the [Policy] to the full extent permitted by law." (*Id.*)

As is typical for long-term disability policies, the Policy provides benefits in two phases. The first phase requires the covered individual to be "unable to perform the material duties of his or her Regular Occupation" and "unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." (R. at 26.) The second phase applies after benefits under the first phase have been paid for 24 months, and tightens the definition of disability by requiring more than just inability to perform the individual's regular occupation. Rather, the covered individual must be "unable to perform the material duties of *any* occupation for which he or she is, or may reasonably become, qualified, based on education, training or experience," and "unable to earn 80% or more of his or her Indexed Earnings." (*Id.* (emphasis added).) If any benefits are owing, LINA pays those benefits directly to the covered individual. (R. at 52.)

## B.    "Regular Occupation" Determination

Johnson applied for long-term disability benefits from LINA on April 6, 2011. (R. at 229–35.) She had last worked for GEICO on December 13 of the preceding year, with the job title of auto damage field supervisor. (R. at 230.) Johnson explained to

2

LINA that she had been battling trigeminal neuralgia for the previous two years. (R. at

221.)[1] The pain from that disorder had progressed to the point where the amount of

pain medication she was taking made it difficult for her to function at work, and

especially to drive—which she was required to do frequently, as a field supervisor. (*Id.*)

LINA investigated and learned that Johnson had indeed been diagnosed with

trigeminal neuralgia, as well as peripheral neuropathy; that she had been seeing a

neurologist for "nerve block" procedures (steroid injections) in certain areas of her face;

that she had been taking "class III narcotics" (presumably referring to Schedule III of the

Controlled Substances Act) for pain control; that she sometimes exhibited slurred

speech and a "clubbed" hand (*i.e.*, uncontrollable finger curling); and that there had

been "positive MRI findings" (otherwise unexplained) in Johnson's cervical spine. (R. at

209.)

Based on this information and Johnson's self-reported symptoms, LINA approved

Johnson for "regular occupation" disability benefits on May 18, 2011. (R. at 207, 941.)

## C.    Social Security Disability Application

As with many other long-term disability plans, the Policy requires approved

---

[1] "Trigeminal neuralgia (TN), also called *tic douloureux*, is a chronic pain condition that affects the trigeminal or 5th cranial nerve, one of the most widely distributed nerves in the head. . . . The typical or 'classic' form of the disorder (called 'Type 1' or TN1) causes extreme, sporadic, sudden burning or shock-like facial pain that lasts anywhere from a few seconds to as long as two minutes per episode. These attacks can occur in quick succession, in volleys lasting as long as two hours. The 'atypical' form of the disorder (called 'Type 2' or TN2), is characterized by constant aching, burning, stabbing pain of somewhat lower intensity than Type 1. Both forms of pain may occur in the same person, sometimes at the same time. The intensity of pain can be physically and mentally incapacitating." *Trigeminal Neuralgia Fact Sheet*, National Institutes of Health—National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Trigeminal-Neuralgia-Fact-Sheet (last visited Sept. 15, 2017) ("*TN Fact Sheet*"). Johnson has been diagnosed with at least the atypical form. (R. at 435, 457, 913.)

claimants to apply for Social Security disability income benefits, which, if awarded, offset LINA's obligations to the extent of the award. (R. at 32, 33.) Johnson applied for Social Security benefits but was initially denied in a decision dated September 19, 2011. (R. at 931.) Johnson appealed that denial and eventually had a hearing before an administrative law judge in December 2012. (R. at 161; *see also* R. at 137.) On January 12, 2013, the Social Security Administration ("SSA") reversed its initial denial and awarded disability benefits to Johnson. (R. at 645.)

### D. "Any Occupation" Determination

On December 11, 2012—about a month before the Social Security award—LINA informed Johnson by letter that the 24 months of her "regular occupation" benefits would expire in June 2013. (R. at 298.) Therefore, LINA wrote, it was beginning its "any occupation" investigation to determine whether Johnson would remain eligible to receive disability payments under the Policy after those 24 months. (R. at 298–99.) LINA also issued requests for Johnson's most recent medical records, and any medical records in her Social Security file. (R. at 128.)

LINA followed up with Johnson through a telephone call on December 20, 2012. (R. at 161.) During that call, Johnson reported "constant headaches," "excruciating pain that goes through [her] ears," and "dizziness spells." (*Id.*) She further reported that she "usually stays at home" and "can't do anything." (*Id.*)

LINA spent the next couple of months gathering Johnson's most up-to-date medical records and a list of her prescriptions, and also continued to request Johnson's medical records "from January 1, 2012 to present" in the SSA's possession. (R. at 128, 289.) LINA also contacted GEICO to verify that Johnson's job required driving. (R. at

125.)

LINA's efforts to obtain Johnson's Social Security medical records continued into May 2013. (R. at 141–43.) Finally, on June 7, 2013, the SSA faxed to LINA the report of a September 3, 2011 consultative examination of Johnson performed by Ryan Otten, M.D. (R. at 636–42.) Obviously, this report pre-dated the SSA's initial denial of Johnson's disability claim.[2] In any event, as of September 3, 2011, Dr. Otten reported that Johnson complained of

> pain 24/7 with no relief. Her pain is 10/10 on a 0 to 10 pain scale. She says it never goes below 8/10. . . . She says she has been undergoing nerve blocks to the face and these only provide benefit for 3 to 4 days. She says she does not sleep well due to this pain. [She] also reports that she has a history of numbness and weakness in her left arm, which has been going on for a couple [of] years. She has a history of cervical spine problems. . . . Lastly, [she] says she suffers from occasional hand cramps, which she has been told is related to hypokalemia [low potassium levels], which is in turn related to her use of hydrochlorothiazide [a prescription drug].

(R. at 637.) As for the exam itself, Dr. Otten noted "mild tenderness" in the trigeminal area on the left side of Johnson's face, "mild discernible discomfort" when he tested her range of motion in her neck and back, "moderate discernible discomfort" when testing range of motion in Johnson's left shoulder, "moderate tenderness" in her cervical spine, and "decreased sensation to light touch diffusely in the left arm." (R. at 639, 640, 641.)

Dr. Otten diagnosed trigeminal neuralgia, disequilibrium of unknown etiology, chronic neck pain (suspected cervical spine degenerative disc disease), insomnia, and

_____

[2] A September 2011 record is obviously outside the "January 1, 2012 to present" range LINA had been seeking. The SSA's facsimile cover page asserts that Johnson visited the administration's Greeley, Colorado, office in person "and requested that [it] fax to [LINA] the attached medical record." (R. at 636.)

suspected depression.  (R. at 641.)  He also stated that his "[f]indings were

commensurate with [Johnson's] complaints," and that "[t]here were no obvious

discrepancies between [her] complaints and the physical examination findings."  (R. at

639, 641.)  He nonetheless offered

> no recommended limitations on the number of hours
> [Johnson] should be able to stand, walk, or sit during a
> normal eight-hour workday.  There are no postural limitations
> recommended at this time.  There are no assistive devices
> recommended at this time.  The amount of weight [Johnson]
> should be able to lift or carry with her left [arm] is limited to
> less than 10 pounds frequently or 20 pounds occasionally.
> There are no recommended weight limitations for her right
> [arm].  It is expected [Johnson] will only rarely be able to
> perform the activities of reaching, pushing, or pulling with her
> left arm as well as grasping, gripping, fingering, handling,
> and feeling with her left hand. . . . Due to disequilibrium,
> [Johnson] should not have any exposure to unprotected
> heights or ladders.  There are no other relevant visual,
> communicative, or workplace environmental limitations
> recommended at this time.

(R. at 641–42.)

Dr. Otten's report was not what LINA had been expecting to receive.  After

reviewing it, LINA soon called Johnson to report that it had received the document "but

it was dated 9/2011" as opposed to something from 2012 or later.  (R. at 137.)  LINA's

representative clarified with Johnson the nature of the Social Security proceeding she

had mentioned on the phone in December 2012, specifically, that it was an ALJ hearing

only and that "[n]o further SSA exams are pending."  (*Id.*)

On June 11, 2013, LINA chose to arrange for an independent medical

examination ("IME") of Johnson.  (R. at 134–35.)  Lloyd J. Thurston, D.O., conducted

the IME on July 24, 2013.  (R. at 631.)  Dr. Thurston's written report of the exam

portrays Johnson as evasive:

6

When I attempted to discuss the specific symptoms and problems from trigeminal neuralgia she simply repeated that it was terrible, she's had multiple injections, and the injections really aren't worth repeating because they don't seem to help and they are costly. And she simply can't work because of this terrible diagnosis and debilitating pain she has experienced. She states she has not received further nerve injections since May 2013. She would not directly answer my question regarding how the history of trigeminal neuralgia currently prevents her from working.

\* \* \*

During the examination she was at times tearful and appeared quite anxious. When I asked specifically why she was on "disability" and unable to work she repeated the story about the onset of her trigeminal neuralgia and how all of the doctors that saw her before she was evaluated at the University of Colorado basically indicated that this was a terrible diagnosis and there was nothing they could offer.

\* \* \*

She talked almost constantly and repeated herself frequently. She did not answer direct questions regarding her abilities and present symptoms. She repeatedly stressed past symptoms and past diagnoses.

(R. at 627, 628, 629.)

Dr. Thurston noted that Johnson

drove herself to the exam and used no assistive devices. She demonstrated no difficulty pulling the office door open when she arrived or pushing the door open when she left the office.

Cervical range of motion appeared normal with no complaint of pain or pain behavior in flexion, extension, side flexion right and left, and rotation right and left. . . . Bilateral shoulder range of motion was normal without complaint of pain, pain behavior or hesitation. Her gait was normal and her balance appeared normal. She was able to easily sit and arise from a chair without difficulty; she was able to climb onto the exam table without apparent difficulty which included lying down and sitting back up on the exam table.

> She demonstrated no objective evidence of dizziness and no complaint of, or evidence of vertigo.
>
> * * *
>
> I did not identify any weakness or limitation in motion of the left shoulder or left [arm]. I found no objective evidence of left [arm] radiculopathy which had previously been diagnosed.

(R. at 627–28.)

Dr. Thurston ultimately concluded, among other things, that "Johnson's pain complaints are not supported by the objective physical examination findings" and "Johnson is significantly exaggerating her physical symptoms and limitations." (R. at 628, 629.)

Dr. Thurston also filled out a LINA-provided Physical Ability Assessment form. On it, he diagnosed chronic pain syndrome, anxiety, fatigue, and "history of trigeminal neuralgia." (R. at 631.) He opined that Johnson could "constantly" (more than two-thirds of the workday) sit, see, and hear; and that she could "frequently" (one-third to two-thirds of the workday) stand, walk, reach, manipulate, grasp, lift and carry 10 pounds, balance, and use foot controls. (R. at 631–32.) He also opined that she could "occasionally" (zero to one-third of the workday) lift and carry 20 pounds, climb stairs, stoop, kneel, and crouch. (R. at 632.)

LINA sent Dr. Thurston's report and Physical Ability Assessment to a rehabilitation specialist for a "transferable skills analysis," *i.e.*, an inquiry into the sorts of jobs Johnson could perform in light of Dr. Thurston's opinions. (R. at 622.) The rehabilitation specialist concluded that Johnson could return to her previous occupation of "Supervisor, Claims," and could also perform satisfactorily as a "Customer Service

Representative Supervisor." (R. at 623.)

Based on Dr. Thurston's opinions and the transferable skills analysis, LINA decided on August 8, 2013 that Johnson did not qualify for "any occupation" disability benefits. (R. at 125.) LINA called Johnson on August 15, 2013 to explain as much. (R. at 118.) On that phone call, Johnson complained that, "in her opinion[,] [Dr. Thurston] was not professional." (*Id.*) LINA's representative apologized and advised Johnson that her formal termination letter would soon be arriving in the mail. (*Id.*)

That letter, dated August 21, 2013, announced that LINA's review had "specifically included" Dr. Thurston's report and physical abilities assessment, the subsequent transferable skills analysis, and Johnson's "Social Security Disability Award Decision." (R. at 275.) "Based on [this] information," said LINA, "it was determined that you are capable of performing" at the level specified by Dr. Thurston, and therefore capable of holding down the jobs identified in the transferable skills analysis. (*Id.*) Specifically concerning the Social Security award, LINA stated that it had "considered [the] fact [of that award] in [its] claim review," but that there was "no new information in [Johnson's] SSA file." (R. at 276.)

## E.    Johnson's First Appeal

Through an attorney, Johnson invoked LINA's administrative appeals process. (R. at 605.) As part of that appeal, Johnson submitted evidence that she continued to obtain frequent nerve block injections in her face, and continued to visit the doctor frequently, all on account of her trigeminal neuralgia. (R. at 454–61, 464–73, 476–574, 600–04.) Johnson also submitted a "Physician Questionnaire on Functional Abilities" filled out on March 10, 2014 by her primary care physician, Egle Bakanauskas, M.D.

(R. at 594–99.)  Among Dr. Bakanauskas's opinions are that Johnson should rarely be required to operate a motor vehicle, that pain would "[c]onstantly" interfere with her attention and concentration, and that her symptoms would likely cause her to miss work three or more times per month.  (R. at 597–98.)

As part of the appeals process, LINA sent Johnson's medical records (including all records received on appeal) to Medical Consultants Network ("MCN"), an independent peer review agency that assigned the file to Todd Graham, M.D., who is board certified in physical medicine and rehabilitation, and in pain medicine.  (R. at 450.)  Dr. Graham issued a written report dated July 24, 2014.  (R. at 442.)  Dr. Graham noted his review of Johnson's medical records, including the records of twenty-four visits for nerve block procedures between March 2010 and April 2014.  (R. at 442–44.)  Dr. Graham also summarized the notes from twenty-three physician visits between November 2010 and May 2014 (a few of these visits appear to overlap with visits for nerve block procedures).  (R. at 445–47.)  This summary included Dr. Thurston's IME. (R. at 447.)

Dr. Graham further reported that he had attempted to speak by telephone with three of Johnson's physicians three times each, but was unable to reach them.  (R. at 448.)  Finally, Dr. Graham provided his opinions:

> Based on review of the provided medical records, there are no objective findings either on exam or on diagnostics that would indicate the need for any type of restrictions.  Patient underwent an Independent Medical Exam [referring to Dr. Thurston's exam] which also noted pain complaints were not supported by objective findings.  There are no findings [since that exam] that would indicate the need for any type of restrictions.

* * *

10

> Patient complained of side effects with almost every
> medication attempted which made compliance with
> medication regiment [*sic*] very difficult.  There were no side
> effects noted though that would alter her activities.

(R. at 449.)

By letter dated August 4, 2014, LINA announced to Johnson that it was "reaffirming [its] previous denial of benefits."  (R. at 254.)  It made this decision relying upon Dr. Graham's report.  (R. at 255.)  It also noted that it still found her Social Security award irrelevant because "[n]o new information from the Social Security file has been provided since the initial Social Security Award.  As a result, we are in receipt of more recent information than the Social Security Administration had to consider at the time of its decision."  (*Id.*)

## F.  Johnson's Second Appeal

LINA will accept a second administrative appeal if the claimant has "different or additional information to submit."  (*Id.*)  Through her attorney, Johnson submitted a second appeal.  (R. at 388.)  This appeal included records of nerve blocks and physician visits since the first appeal.  (R. at 431–39.)  It also contained a lengthy letter from Johnson's attorney summarizing Johnson's memories of Dr. Thurston's IME, including the following:

- "When Desiree Johnson explained that her experiences with relief from the nerve blocks and injections did vary, with treatment helping and sometimes not helping significantly, Dr. Thurston voiced his opinion in a quite revealing manner, stating to her directly: 'I can see why your doctors don't believe you.'  Of course, there is nothing in the clinical record or in the evidence available that would suggest that any of the doctors did not

11

believe Desiree Johnson."

- "[Dr. Thurston] explained that he did not examine any of [Johnson's medical] records except for some information from a chiropractor."

- "During the interview Dr. Thurston said to Desiree Johnson, '. . . You don't want to work . . .' He asked her why are you 'not working out?' He stated to her directly that there is 'nothing wrong with you,' and 'why does your family have to do everything?' When Desiree Johnson explained to Dr. Thurston the various triggers for [her pain], including . . . talking on the phone, . . . Dr. Thurston's comments included, 'I thought all women liked to be on the phone[.]' Dr. Thurston referred in his conversation with Desiree Johnson to her health problems as a 'so-called disease.'"

(R. at 415–16.)

About a week after submitting the letter, Johnson's attorney submitted an affidavit from Johnson herself. In relevant part, her description in that affidavit of the IME with Dr. Thurston is as follows:

> The visit and interview with Dr. Thurston took about one hour. He confronted me with arguments that he didn't think I had trigeminal neuralgia. However, at the same time, he explained that he did not have familiarity with trigeminal neuralgia. He confronted me with comments indicating that he believed I was faking. . . . Dr. Thurston scrutinized a list of the medicines I was taking and declared what they were for as opposed to what they were being prescribed for in my case. Dr. Thurston did not express familiarity with the [medical] records . . . . Dr. Thurston belittled and minimized my symptoms.
>
> . . . My lawyer's letters to [LINA] present more facts about that interview.
>
> Dr. Thurston suggested that I have the capacity to work

because I drove myself to the [IME]. He did not take into account my explanation that my driving abilities are limited. I typically drive about 2 to 3 miles per occasion, only about twice per week. . . . Dr. Thurston suggested I had "no difficulty" pulling and pushing his office door. These are isolated instances of momentary physical activity. They do not constitute a representative survey of my physical capacity.

* * *

Dr. Thurston told me that he thought, apparently, because I explained receiving limited relief from nerve blocks and injections, from time-to-time and with variability, that he thought that demonstrated why my treating doctors did "not believe" me. I do not know where he got this information from. My treating doctors have never expressed that they do not believe me.

(R. at 385–86.) Johnson further explained in that affidavit about her nerve block

procedures:

I have pursued treatment with various doctors as appropriate and subject to available financial resources. At times nerve blocks and injections have provided some, partial relief of a short duration (such as about two weeks), and at other times they have not provided much relief at all. As a result, this has occasionally discouraged me from pursuing injections because each occasion when I receive nerve blocks and injections, the charges are about $8000.00. . . .

* * *

I have at times been unable to pursue care due to financial issues and loss of insurance because of the loss of my employment and my husband's loss of his employment.

(R. at 386–87.)

Having received Johnson's additional submissions, LINA sent Johnson's medical

records to another independent peer review group known as MLS Peer Review Service

("MLS"). (R. at 80–81.) MLS sent those files to two different physicians: Jamie Lewis,

M.D., and David Hoenig, M.D.  Both physicians responded with written reports dated

May 4, 2015.  (R. at 359, 369.)

Dr. Hoenig, who is board-certified in psychiatry, neurology, and pain medicine,

reviewed and summarized Johnson's medical records.  (R. at 359–64.)  This included a

lengthy summary of Dr. Thurston's IME report.  (R. at 360.)  It also included a lengthy

summary of one record no previous reviewer had mentioned, namely, Dr. Otten's

September 2011 report of his exam prior to the initial denial of Johnson's Social

Security disability claim.  (R. at 361.)

Dr. Hoenig reported attempting to reach three of Johnson's physicians by

telephone, and successfully reaching Dr. Bakanauskas (Johnson's primary care

physician).  (R. at 364.)  Dr. Hoenig summarized the conversation as follows:

> [Dr. Bakanauskas] states that [Johnson] has back pain and
> neck pain for about seven years.  She also has trigeminal
> neuralgia.  [Johnson] states that pain is the main issue for
> her.  [Johnson] has some sensory changes in her face and
> arms and reduced sensation in the face.  [Johnson] states
> that she feels that she cannot work because of pain issues.

(*Id.*)  As for his opinion, Dr. Hoenig wrote in relevant part as follows:

> Based on the documentation provided, and from a
> neurological perspective only, the claimant is not physically
> functionally limited from 07/31/2013 and continuing.  It is
> acknowledged that the claimant has trigeminal neuralgia.  It
> is also acknowledged that there are findings on examination
> at times where there is hypersensitivity to the left face.
> However, there is no documentation as to how she is
> physically incapacitated from her symptoms. . . .  It is not
> clear why the claimant has not had a further workup for her
> trigeminal neuralgia as well as her difficulty with her left arm
> if it is so significant.  There is no documentation of an MRI of
> the brain.  There is no documentation of an EMG nerve
> conduction study.  There is no documentation of aggressive
> medication management or even a neurosurgical
> consultation.  The claimant has had multiple nerve blocks.

14

> However, it is not clear why she has had so many nerve blocks when the effect is fleeting. There is no specific documentation of medication side effects.

> * * *

> . . . Her complaints are subjective and she does describe her pain as severe and continuous. It is felt, according to the claimant, that this affects her functionality. There is no documentation that the pain affects her cognition. It should be noted that these complaints are subjective, but there does not appear to be any objective correlate that would result in limitations in functionality.

(R. at 365.)

As for Dr. Lewis, who is board-certified in physical medicine and rehabilitation, and in pain medicine, he began his report, like Dr. Hoenig, by summarizing the medical documentation. (R. at 370–72.) As with Dr. Hoenig, Dr. Lewis's summary contains comparatively lengthy descriptions of Dr. Otten's September 2011 exam and Dr. Thurston's July 2013 IME. (R. at 370, 371.)

Dr. Lewis reported attempting to reach three of Johnson's physicians by telephone, on two occasions each, but all of these attempts were unsuccessful. (R. at 372–73.) As for his opinion, Dr. Lewis wrote in relevant part as follows:

> [Johnson] was diagnosed with trigeminal neuralgia. Treatment has included numerous medication trials as well as multiple procedure notes of injections to include [nerve blocks] since 2010. She has also been diagnosed with atypical face pain, peripheral neuropathy and chronic pain syndrome. Although she has self-reported limitations[,] and continual atypical facial pain despite ongoing frequent . . . nerve blocks, this does not result in impairment. The claimant is alert and orientated. There are no significant neurological deficits. Examination reveals hypersensitivity at the left trigeminal nerve distribution. . . . It was indicated on an Independent Medical Evaluation [*i.e.*, Dr. Thurston's report] that the claimant has "significantly exaggerated her symptoms." [Dr. Thurston] noted that the claimant's self-

reported reports of pain were not consistent with the objective findings. Based on all the documentation provided for review there are no clinical findings to medically support restrictions and limitations from a physical medicine and pain perspective.

\* \* \*

Ms. Johnson endorses significant pain symptoms that [have] been ongoing since 2008 despite continual treatments with [nerve blocks] where she does report short-term symptomatic relief; however, there are no supported objective medical findings that would reasonably result in functional impairments. Furthermore, there is no evidence of any cognitive impairment based on the documentation provided for review.

(R. at 373–74.)

By letter dated May 22, 2015, LINA announced that it was again affirming its termination of benefits. (R. at 237.) By way of explanation, LINA summarized Dr. Hoenig's and Dr. Lewis's reports. (R. at 238.) LINA also returned to Dr. Thurston's report: "[Y]our client underwent an Independent Medical Evaluation . . . indicating that her symptoms were significantly exaggerated and self-reports of pain were inconsistent with clinical findings." (*Id.*) LINA made no mention of Johnson's accusation that Dr. Thurston had conducted the IME antagonistically.

With no further administrative appeals available, Johnson filed this lawsuit. (ECF No. 1.)

## II. STANDARD OF REVIEW

ERISA governs employee benefit plans, including disability benefit plans. 29 U.S.C. §§ 1101 *et seq.* "When an individual covered by the plan makes a claim for benefits, the administrator gathers evidence, including the evidentiary submissions of the claimant, and determines under the plan's terms whether or not to grant benefits. If

16

the administrator denies the claim, the claimant may bring suit to recover the benefits due to him under the terms of his plan." *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) (internal quotation marks omitted; alterations incorporated). Federal courts have exclusive jurisdiction over such suits, as ERISA preempts most relevant state laws. 29 U.S.C. § 1144(a).

Normally when the ERISA-governed plan at issue "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the plan administrator's denial of benefits is reviewed under an arbitrary-and-capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Policy at issue here reserves such discretionary authority to LINA. (R. at 52.) Whether the arbitrary-and-capricious standard actually applies, however, has prompted a rather convoluted series of arguments in this case.

In her opening brief, Johnson argued that such a reservation of discretion is not permitted by Colorado Revised Statute § 10-3-1116(2), which was enacted in 2008 and reads as follows: "An insurance policy, insurance contract, or plan that is issued in this state that offers health or disability benefits shall not contain a provision purporting to reserve discretion to the insurer, plan administrator, or claim administrator to interpret the terms of the policy, contract, or plan or to determine eligibility for benefits." (*See* ECF No. 71 at 4.)[3] If this statute nullifies the Policy's reservation, then this Court's review of LINA's decision would be *de novo*. *See Firestone*, 489 U.S. at 115. Johnson further argued that application of this statute should not be considered retroactive

---

[3] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly if the document contains prefatory material (such as a table of contents).

application in her case.  Although the Policy came into being before 2008, Johnson

argued that various events relevant to her participation in the Policy took place after

2008.  (ECF No. 71 at 4–6.)[4]

In response, LINA argued that the Policy, by its terms, is governed by District of

Columbia law, which apparently has no similar statute.  (ECF No. 75 at 34 (citing R. at

23).)  Then, in reply, Johnson changed tactics and argued for the first time that neither

Colorado nor D.C. law governs the Policy.  Rather, Johnson argued, Maryland law

governs the GEICO Benefits Program (of which the Policy is a part) and the GEICO

Benefits Program's choice of law supposedly supersedes the Policy's choice of law.

(ECF No. 76 at 7–8.)  Maryland, it appears, possesses a statute similar to Colorado

Revised Statute § 10-3-1116(2).  (*See id.* at 7 (citing Md. Code, Ins. § 12-211(b)).)

The Court could have deemed this argument forfeited, but given the importance

of the issue, the Court instead solicited a surreply from LINA.  (ECF No. 80.)  While that

surreply was pending, Johnson moved to file supplemental authority, namely, a District

of Maryland decision interpreting and enforcing the relevant Maryland statute to nullify

an ERISA fiduciary's reservation of discretion.  (ECF No. 81 (citing *Weisner v. Liberty

Life Assur. Co.*, 192 F. Supp. 3d 601, 609–13 (D. Md. 2016)).)  The *Weisner* decision

dates from before briefing began in this case, and therefore does not fall within the

undersigned's practice standard regarding supplemental authority.  *See* WJM Revised

Practice Standard III.K ("A motion for leave to cite new relevant authority may be filed if

---

[4] A couple of months after Johnson submitted this argument, the Court decided a
separate ERISA case (which happened to involve LINA and another claimant surnamed
Johnson), and held that Colorado Revised Statute § 10-3-1116(2) applies prospectively only.
*Johnson v. Life Ins. Co. of N. Am.*, 2017 WL 1154027, at *10–13 (D. Colo. Mar. 28, 2017),
*appeal dismissed* (July 14, 2017).

the supplemental authority was issued after briefing on a motion had closed.").  In the interest of justice, however, the Court excused that failing, granted Johnson's motion, and directed LINA to address *Weisner* in its forthcoming surreply.  (ECF No. 82.)

LINA's surreply conceded that Maryland law controls.  (ECF No. 83 at 1–2.) LINA argued, however, that the Maryland statute in question was enacted in 2011 and does not apply retroactively, meaning it would not apply to the Policy at issue here.  (*Id.* at 2–4.)  As for *Weisner*, LINA argued—correctly—that the question of retroactivity was never presented in that case, and so it is irrelevant for present purposes.  (*Id.* at 4 n.2.)

This leaves the Court in a frustrating position.  Johnson's counsel should have raised the question of Maryland law in Johnson's opening brief, but the Court excused that failure and allowed the argument in the reply brief to stand.  Johnson's counsel should have cited *Weisner* in the reply brief at the latest, but the Court excused that failure as well and allowed *Weisner* to be submitted as supplemental authority.  And now the Court is faced with LINA's surreply retroactivity argument—something Johnson's counsel has nowhere addressed, even though the Court has yet to see an ERISA case in the last several years that has *not* raised a retroactivity argument centered around Colorado Revised Statute § 10-3-1116(2) or similar statutes in other states (as Johnson's counsel raised in Johnson's opening brief, directed at the Colorado statute).  Thus, it is difficult to understand how Johnson's counsel could belatedly raise the Maryland-law argument and yet fail to anticipate the retroactivity objection.  Given that failure, the Court finds itself again facing an unanswered argument.

Under most circumstances, the Court would simply hold that Johnson has forfeited any counterargument to LINA's claim that the Maryland statute applies

prospectively only.  But the Court need not hold as much (and makes no ruling

regarding the Maryland statute) because, as will become clear below, it would not

matter.  Even under the arbitrary-and-capricious standard for which LINA argues, the

Court finds that LINA's termination of benefits must be reversed.  Thus, the analysis

below assumes that Policy's reservation of discretion to LINA remains enforceable

irrespective of any potentially applicable state statute.

Under this assumption, the arbitrary-and-capricious standard applies, which the

Tenth Circuit has described as follows:

> Indicia of arbitrary and capricious decisions include lack of
> substantial evidence, mistake of law, bad faith, and conflict
> of interest by the fiduciary.  Substantial evidence is such
> evidence that a reasonable mind might accept as adequate
> to support the conclusion reached by the decisionmaker.
> Substantiality of the evidence is based upon the record as a
> whole.  In determining whether the evidence in support of
> the administrator's decision is substantial, we must take into
> account whatever in the record fairly detracts from its weight.
> We give less deference if a plan administrator fails to gather
> or examine relevant evidence.

*Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (citations and

internal quotation marks omitted; alterations incorporated).[5]

## III.  ANALYSIS

As it turns out, the Court need only focus on LINA's decision as of the second

appeal.  At that point, it had the fullest record before it.  Thus, the analysis below is

---

[5] The parties agree that LINA both evaluates and pays any claim for benefits.  LINA therefore has an inherent conflict of interest between its own desire to turn a profit and its fiduciary duty to fairly evaluate all claims.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).  The effect of that conflict of interest, if any, is one factor that this Court must consider when evaluating whether LINA's decision was arbitrary and capricious.  *Id.* at 117.  The Court's analysis below would be the same regardless of the conflict of interest.  The Court therefore will not give it any further discussion.

specific to the second appeal, although the initial determination and first appeal remain relevant for context and clarity.

## A.     The Centrality of a Credibility Determination

The Court must emphasize at the outset that Johnson's credibility was essentially the only issue at stake when LINA chose to terminate benefits and affirmed that decision.

LINA correctly points out "the critical distinction between the evidence of a functional impairment and the evidence of a medical condition or diagnosis." (ECF No. 75 at 65.)  For a disability plan administrator such as LINA, functional impairment is the ultimate question, apart from any particular diagnosis.  So, in Johnson's case, her trigeminal neuralgia diagnosis and her complaints of pain flowing from trigeminal neuralgia are secondary to the larger question of whether she is in any sense functionally impaired by the pain she claims that she experiences regularly.

This will inevitably present a credibility question.  According to the National Institute of Health, trigeminal neuralgia can sometimes be traced to a physiological abnormality such as a blood vessel compressing the trigeminal nerve, but it is frequently a diagnosis of exclusion after various other potential causes of facial pain are ruled out. *See TN Fact Sheet*, *supra*.  Thus, similar to ailments like fibromyalgia, "the claimant's subjective, uncorroborated complaints of pain constitute the only evidence of the ailment's severity."  *Meraou v. Williams Co. Long Term Disability Plan*, 221 F. App'x 696, 705 (10th Cir. 2007).[6]  LINA implicitly acknowledged as much in its second appeal

_____

[6] From LINA's point of view, medical evidence of, *e.g.*, a blood vessel impinging on the trigeminal nerve would nonetheless be "irrelevant" because that is evidence supporting only the diagnosis, not its disabling effects.  (*See* ECF No. 75 at 65.)

determination. The last substantive sentence of its explanation for affirming the denial of benefits repeats Dr. Thurston's opinion that Johnson's "symptoms were significantly exaggerated and self-reports of pain were inconsistent with clinical findings." (R. at 238.)

Under the arbitrary-and-capricious standard, credibility judgments "are the province of the [disability plan] administrator," *Meraou*, 221 F. App'x at 705, as they are for any question of fact. Nonetheless, they must be supported by substantial evidence.

## B.    Substantial Evidence Under the Record as a Whole

"[I]n the substantial evidence analysis, the denominator (all available evidence) is as important as the numerator (the evidence relied upon to reach a decision)." *Lamont v. Conn. Gen. Life Ins. Co.*, 215 F. Supp. 3d 1070, 1080 (D. Colo. 2016). In this case, by the time of the second appeal LINA's "denominator" when evaluating Johnson's credibility was the following:

- LINA's prior award of benefits;

- SSA's award of benefits;

- Johnson's medical records from 2010 up through the months just before the second appeal determination;

- Dr. Bakanauskas's opinion that Johnson is disabled;

- Dr. Thurston's IME report;

- Johnson's affidavit describing her experience with Dr. Thurston; and

- the peer review reports of Drs. Graham, Hoenig, and Lewis.

The Court will examine all of these items in turn.

1.    LINA's Prior Award of Benefits

LINA claims that its choice to approve Johnson under the "regular occupation"
standard "is not at issue in this case."  (ECF No. 75 at 16 n.5.)  LINA is partially correct
and partially incorrect.  This Court has not been asked to review LINA's "regular
occupation" decision, so in that sense it is "not at issue."  But it remains relevant
nonetheless.

LINA's "any occupation" decision concluded that Johnson could return to her
previous job.  Although in the guise of an "any occupation" determination, this is
functionally no different than a reconsideration of the original decision on grounds either
that Johnson had been lying when she applied for "regular occupation" benefits or that
Johnson's condition had improved in the meantime.  In either case, the Tenth Circuit
has endorsed a special standard: "[U]nless information available to an insurer alters in
some significant way, the previous payment of benefits is a circumstance that must
weigh against the propriety of an insurer's decision to discontinue those payments."
*Williams v. Metro. Life Ins. Co.*, 459 F. App'x 719, 731 (10th Cir. 2012).  "[I]t is [not] *per
se* arbitrary and capricious for an insurer to fail to *discuss* its own prior decision(s) to
award disability benefits, [but] the claimant's prior receipt of disability payments cannot
be considered irrelevant."  *Lamont*, 215 F. Supp. 3d at 1079 (emphasis in original).
"Total failure to discuss prior benefits certainly raises the suspicion of an inadequately
reasoned decision."  *Id.*

Here, the second appeal decision letter (much less the two decision letters
preceding it) says nothing about the weight accorded to LINA's award of benefits under
the "regular occupation" standard.  Perhaps LINA believed that the transition to the "any

occupation" standard obviated the need to account for its prior "regular occupation" decision, and in many instances that is probably true because the "any occupation" and "regular occupation" standards are different. But in this case, as noted, the two standards effectively merged and a decision as to one was a decision as to the other. LINA's failure thus "raises the suspicion of an inadequately reasoned decision." *Id.*

## 2. SSA's Prior Award of Benefits

LINA's brief repeatedly invokes Dr. Otten's September 2011 examination report, which simultaneously found nothing to contradict Johnson's self-reported symptoms yet also found her fairly capable. (*See* ECF No. 75 at 44, 45, 47–48, 49.) But nothing in the record supports LINA's current claim that Dr. Otten's findings had any relevance in its decision to terminate benefits, its decision on the first appeal, or its decision on the second appeal.

In LINA's August 2013 letter announcing its decision to terminate benefits, LINA said it reviewed the "Social Security Disability Award Decision" but there was "no new information in [Johnson's] SSA file." (R. at 275, 276.) The letter contains no discussion of Dr. Otten's report, or even any language that could be considered a quotation from or allusion to Dr. Otten's report. This is not surprising given that SSA eventually awarded benefits, thus showing that it had rejected Dr. Otten's report.

Dr. Otten's report also receives no mention in LINA's letters explaining the outcome of the first and second appeals. In both of those letters, rather, LINA announced, "No new information from the Social Security file has been provided since the initial Social Security Award. As a result, we are in receipt of more recent information tha[n] the Social Security Administration had to consider at the time of its

24

decision." (R. at 255; *see also* R. at 239.) These statements can only be reasonably interpreted as LINA's explanation that it deemed whatever information it found in Johnson's Social Security file to be irrelevant. Given this, the Court ignores LINA's arguments based on Dr. Otten's report. These arguments are *post hoc* attempts to shore up LINA's decision with materials it never considered, and which are of highly questionable relevance given that SSA ultimately rejected Dr. Otten's report.

Moreover, LINA's inexplicable failure to accord *any* weight to Johnson's Social Security disability award is itself very highly suspect.[7] That award was only eight months old when LINA decided to terminate Johnson's benefits in August 2013, and by necessary implication it rejected Dr. Otten's exam finding that Johnson remained physically capable to perform a wide range of work. LINA went on to claim in both the first and second appeals that it possessed "more recent information" than SSA (R. at 239, 255), but to the extent that information was unfavorable to Johnson, it comprised only Dr. Thurston's IME report and the peer review reports of Drs. Graham, Hoenig, and Lewis. As will become clear below, all of those reports are unreliable.

3.    Johnson's Medical Records

Johnson's medical records primarily show that Johnson repeatedly sought expensive nerve block injections, administered in various locations around her face and neck. There is no hint in any of LINA's three decision letters that LINA considered this

---

[7] The Social Security disability standard is stricter than the Policy's "any occupation" standard because it has no connection to the claimant's education, training, experience, or prior earnings. *See* 42 U.S.C. § 423(d)(1)(A) (disability defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months").

information. Even if it had considered it, it takes no sophisticated medical training to understand that an individual does not continually seek out doctors to poke needles around her skull unless there is a serious and chronic condition to be treated. (*Cf.* R. at 628 (Dr. Thurston's summary of Johnson's claim of "discomfort" while undergoing injections).)

### 4.   Dr. Bakanauskas's Disability Opinion

LINA correctly points out that, under the arbitrary-and-capricious standard, the Court cannot declare that Dr. Bakanauskas's disability opinion deserves more weight than any other physician's opinion. *See, e.g.*, *Williams*, 459 F. App'x at 728 ("[T]he job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans." (internal quotation marks omitted; alteration in original)). It is important to point out, however, that Dr. Bakanauskas's opinion receives no discussion in LINA's three letters.

### 5.   Dr. Thurston's IME Report & Johnson's Affidavit

Dr. Thurston's report provided LINA with numerous opinions and potential insights regarding Johnson. But by the time of the second appeal, the evidentiary value of this report should have been called into serious doubt by Johnson's affidavit regarding her experience with Dr. Thurston—a matter about which LINA says nothing in its second appeal determination letter. Johnson's affidavit alleges that Dr. Thurston approached the IME in an aggressively confrontational and partisan manner, with a "no disability" finding as a foregone conclusion, and that he otherwise behaved unprofessionally.

Johnson's affidavit did not come out of the proverbial "left field." LINA's claim

notes record that she reported Dr. Thurston's unprofessional behavior to LINA over the phone only a few weeks after the exam.  (R. at 118.)  Moreover, consistent with Johnson's allegations, Dr. Thurston's report displays a persistently and otherwise unexplained skeptical and impatient tone.  For example:

- "When I attempted to discuss the specific symptoms and problems from trigeminal neuralgia she simply repeated that it was terrible, she's had multiple injections, and the injections really aren't worth repeating because they don't seem to help and they are costly.  And she simply can't work because of this terrible diagnosis and debilitating pain she has experienced."  (R. at 627.)

- "When I asked specifically why she was on 'disability' and unable to work she repeated the story about the onset of her trigeminal neuralgia and how all of the doctors that saw her before she was evaluated at the University of Colorado basically indicated that this was a terrible diagnosis and there was nothing they could offer."  (R. at 628.)

- "She talked almost constantly and repeated herself frequently."  (R. at 629.)

Given all of this, LINA could not reasonably put any degree of confidence in Dr. Thurston's IME report by the time of the second appeal, and to the plain extent that it did, this was error.  Thus, that report became of essentially no evidentiary value.

6.    Peer Review Reports

Two problems substantially undermine the probative value of the reports LINA received from Drs. Graham, Hoenig, and Lewis.

27

The first problem is the uncertain and likely biasing effect of including Dr. Thurston's report and (in the case of Drs. Hoenig and Lewis) Dr. Otten's report among the medical files to be reviewed, especially without any additional context.  Out of the many medical records summarized, Dr. Thurston's report is the *only* medical record that receives specific mention in the ultimate opinions of Drs. Graham and Lewis. (R. at 374, 449.)  Dr. Lewis, in particular, quotes Dr. Thurston's opinion that Johnson "has 'significantly exaggerated her symptoms.'"  (R. at 374.)  Yet none of the doctors showed any awareness of Johnson's claims regarding Dr. Thurston's antagonistic approach to the exam.  Similarly, Drs. Hoenig and Lewis show no awareness that Dr. Otten's report had been prepared for SSA disability purposes, and that it was ultimately rejected.

The second problem is that all three reports reduce to the same basic conclusion, namely, a lack of objective medical evidence to establish that Johnson's self-reported pain is as disabling as she claims.  But what value is such a conclusion to LINA when judging Johnson's credibility?  No peer-review physician questioned whether trigeminal neuralgia is a real condition.  No peer-review physician disputed that trigeminal neuralgia can cause disabling pain.  And no peer-review physician challenged Johnson's trigeminal neuralgia diagnosis.  Thus, the physicians' observation that no objective medical evidence supported the claimed severity of Johnson's trigeminal neuralgia symptoms only highlights the fact that the real question is Johnson's credibility when she claims that her pain is disabling.

Only Dr. Hoenig's report provides anything approaching information that would assist LINA in judging credibility:

28

> It is not clear why the claimant has not had a further workup
> for her trigeminal neuralgia as well as her difficulty with her
> left arm if it is so significant.  There is no documentation of
> an MRI of the brain.  There is no documentation of an EMG
> nerve conduction study.  There is no documentation of
> aggressive medication management or even a neurosurgical
> consultation.

(R. at 365.)  Dr. Hoenig appears to be saying that a patient truly suffering from

trigeminal neuralgia would pursue these steps, and implying that Johnson's failure to

pursue these steps shows she does not suffer to the extent she claims.  Such an

implication is missing an indispensable premise: evidence that anyone told Johnson to

in fact pursue these steps.  No party has pointed the Court to any evidence of Johnson

being advised by a medical professional to undergo the sort of testing Dr. Hoenig

discusses.  Nor could LINA presume (assuming it recognized the missing premise) that

these are the sorts of tests any layperson would demand without prompting by his or

her treating provider.

Viewed in this light, the three peer review reports offered nothing of substance to

LINA, and could not be relied upon to justify, affirm, or reaffirm termination of benefits.

7.    Synthesis

Considering all of the foregoing, LINA's decision displays two fundamental

weaknesses.

First, an ERISA plan administrator's decision may only be upheld if "it is

predicated on a reasoned basis."  *Adamson v. Unum Life Ins. Co.*, 455 F.3d 1209, 1212

(10th Cir. 2006).  The Court has no confidence that LINA in fact reached a "reasoned"

decision.  Rather, through the initial determination, first appeal, and second appeal, it

appears LINA simply adopted the last piece of evidence to come in the door as its own

opinion.  There is no hint that contrary evidence might exist—and even under the arbitrary-and-capricious standard, an ERISA plan administrator deserves "less deference if [it] fails to gather *or examine* relevant evidence."  *Caldwell*, 287 F.3d at 1282 (emphasis added).

Second, when the available evidence is actually examined, the amount of reliable, probative evidence detracting from Johnson's credibility is essentially zero. Consequently, there was "not a sufficient quantum of evidence from which reasonable minds could conclude," *Lamont*, 215 F. Supp. 3d at 1080, that Johnson was not credible in her complaints of disabling pain.  LINA's decision to terminate benefits was therefore erroneous.[8]

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Defendant's termination of benefits is REVERSED;

2.      Plianitff's [*sic*] Unopposed Request for Oral Argument on the Merits Under ERISA (ECF No. 77) is DENIED AS MOOT;

3.      The Clerk shall enter judgment in Plaintiff's favor and against Defendant.  Plaintiff is entitled to an award of past long-term disability benefits from the date immediately following termination (August 1, 2013) through the date of judgment, and Plaintiff's long-term disability benefits shall be reinstated as of the date of judgment;

---

[8] Johnson's briefing contains a rather elaborate calculation of the specific dollar amounts she believes she is owed.  (ECF No. 71 at 36–37.)  It is not clear that this is an appealable issue (*i.e.*, something exhausted through LINA's administrative channels, and otherwise appealable under ERISA).  Johnson also includes no specific request for relief to which LINA could respond.  The Court therefore makes no ruling in this regard.

4.   No later than 14 days after entry of judgment:

   a.   Plaintiff may file a bill of costs upon compliance with D.C.COLO.LCivR

        54.1;

   b.   Plaintiff may file an appropriate motion for attorneys' fees pursuant to

        29 U.S.C. § 1132(g) upon compliance with D.C.COLO.LCivR 54.3; and

5.   The Clerk shall terminate this case.


Dated this 21st day of September, 2017.

                                        BY THE COURT:

                                        _____
                                        William J. Martinez
                                        United States District Judge